ALLEN v. PEGRAM *et. al.*

1. BANKS: TERRITORIAL CHARTER. The act of Congress of July 1st, 1836, requiring the approval and confirmation of Congress to give validity to any act of a Territorial Legislature incorporating any bank, or any institution with banking powers or privileges, was applicable to territories organized after its enactment, and was not repealed by the organic act of the Territory of Nebraska.

2. REPEALS NOT FAVORED. Repeals by implication are not favored.

3. NEBRASKA: BANK CHARTER. The issue of bills and the exercise of other banking powers by a corporation organized under a charter granted by the Territorial Legislature of Nebraska, which was never confirmed or approved by Congress, were without authority of law.

4. CONTRACT TO REDEEM BILLS ISSUED WITHOUT AUTHORITY OF LAW. The officer of a banking corporation who is individually liable for the redemption of bills issued by such corporation without authority of law, may, for a valid and sufficient consideration, contract with another party to redeem the bills for him.

5. AGENT RESPONSIBLE WHEN ACTING FOR CORPORATION NOT EXISTING. When the grantors in a deed purport to execute a deed containing covenants as the officers and agents of a banking corporation which has no legal existence, they are personally liable under the covenants of the deed.

Allen v. Pegram.

6. COVENANTS IN DEED. The general rule is, that if a deed contains no cove-
nants, in the absence of fraud, all questions of title are at the risk of the
grantee; if it contains covenants,. the grantee must have recourse to
them if his title fails. The grantee cannot withhold the consideration
while he remains in the undisturbed possession of the property sold.

7. BANK STOCK. Stock in a banking incorporation is incorporeal personal
property; and when it is sold and there is nothing in the contract or in
the circumstances to repel the presumption, the vendor is considered to
warrant its title, and that it is legally what it purports to be in fact; but
not its quality or value.

8. RESCISSION OF CONTRACT. The extent to which, and the manner in which,
contracts may be rescinded, considered and discussed.

9. PRACTICE: ISSUES MAY BE WITHHELD FROM A JURY. Whenever the essen-
tial elements of a cause of action or a defense are without proof the
court should refuse to allow it to go to the jury.

*Appeal from Pottawattamie District Court.*

FRIDAY, APRIL 22.

BY the pleadings in the case, which are very voluminous,
covering, with the exhibits, some seventy-six pages of the
transcript, the following facts appear: On the 18th day
of January, 1856, the Legislature of the Territory of Ne-
braska passed an act, which was duly approved by the
Governor, chartering the Bank of Nebraska at Omaha,
in which the said Allen, Pegram *et al.*, were made com-
missioners to carry it into effect, with an authorized capital
of $100,000, to be divided into shares of $100 each, with
power to issue bills, deal in exchange and do all acts
necessary to a regular and legitimate banking business, and
to buy and dispose of property of all kinds; sue and be
sued, and making each stockholder individually liable for
the redemption of the bills. This act was never confirmed
or approved by Congress. Under it the bank therein
authorized was organized, and the plaintiff became the
owner of the charter and stock. A banking house con-
taining a safe, office-furniture, &c., together with the lot on

which the banking house was situated, and also the stock· of the plaintiff in the bank, and it may be all other rights of the plaintiff, were, in 1857, sold by him to the defendant for $15,000; of which sum the defendant paid $2,500, and gave his notes and a deed of trust on other property for the security of the balance. A disagreement arising between the plaintiff and defendant in relation to the redemption of the old issues of the bank, the parties on the 25th day of June, 1858, canceled the old contract and made the one upon which the present action of the plaintiff is brought. This contract is quite lengthy, but the material portions of it may be condensed and stated thus: 1st. Pegram admits an indebtedness to Allen of $12,500, to be paid as stated in the said contract. 2d. Pegram agrees to redeem the issue of the bank which is signed by Allen as president, and Moffit as cashier, and to use the same only as specified in the contract. 3d. Pegram is to pay the admitted indebtedness of $12,500 to Allen as follows: In notes of the said bank signed by Allen as president, and Moffit as cashier, in sums of $1,000. When Pegram shall pay $1,000, Allen is to retire and cancel a like amount of the said issues of the bank. 4th. When Pegram shall have thus paid $9,000, and Allen shall have retired $9,000, "there will still be due from Pegram to Allen $3,500, without reference to the retirement of the issues of the Bank of Nebraska as aforesaid."

Allen brought suit on this contract against Pegram, claiming $15,000, alleging performance on his part and a failure and a refusal by the defendant to keep and perform the contract on his part. The breaches relied on are not specifically assigned, and the breach to which the evidence chiefly related was the failure and refusal of defendant to redeem $1,500 of the old issues of the bank, presented in March, 1860. The answers, and various amended answers, in substance, set up the following defenses: 1st. *Total*

*want of consideration:* In this, that the only consideration for the contract sued on, was the conveyance of the banking house and lot in Omaha, by a deed executed by Allen as president, and Moffit as cashier of the Bank of Nebraska, to the defendant, and the transfer of what purported to be one thousand shares of the capital stock of the said bank, for which defendant agreed to pay $15,000, and paid down $2,500. That the stock was of no value, being illegal and void, and the deed to the real estate conveyed no title. 2d. *Fraud:* In this, that the plaintiff falsely and fraudulently represented to the defendant that the act of the Territorial Legislature conferred banking powers and privileges; that the bank had been duly incorporated, &c., whereas the act was of no force and conferred no rights, never having been approved by Congress, and all the pretended transfers of property to the defendant conferred no rights and were of no value. 3d. *Illegality of consideration:* In this, that all bills issued by the bank, and all contracts in relation to the redemption thereof, were in violation of law, illegal and void, &c. The replication takes issue upon these defenses, and sets up that the consideration of defendant's contracts was: 1st. The conveyance of the realty; 2d. The transfer of personal property, including a safe worth $2,000; 3d. The assignment of the stock and all powers and privileges under the act. It also sets up that the defendant has sold and conveyed one-half of the realty to another party, and has also sold and conveyed his title to the stock and the bank. On these issues, the cause was tried by a jury, who found for the defendant. The plaintiff made a motion for a new trial which was overruled; judgment was rendered upon the verdict and the plaintiff appeals.

*D. O. Finch* for the appellants.

*C. C. Cole* with *Clinton & Riddle* for the appellee.

DILLON, J.—I. It is conceded that the Congress of the United States never confirmed or approved the act of the Territorial Legislature which chartered the Bank of Nebraska; and one question which lies at the basis of this controversy, and which meets us at the outset is: Was such approval and confirmation necessary? On the 1st day of July, 1836 (U. S. Stat. at Large, vol. 5, p. 61), it was enacted by Congress: "Sec. 1. That no act of the Territorial Legislature of any of the United States incorporating any bank or any institution with banking powers or privileges, hereafter to be passed, shall have any force or effect whatever until approved and confirmed by Congress." There has been no express repeal of this act, and it remains in force, unless it is impliedly repealed by the organic act for the Territory of Nebraska. Section six (6) of this organic act declares: "That the legislative power of the territory shall extend to all rightful subjects of legislation, consistent with the Constitution of the United States and this act," &c. (U. S. Stat. at Large, vol. 10, p. 279; Brightley's Digest, p. 682.) The act then proceeds to declare that "No law shall be passed interfering with the primary disposal of the soil," &c., but contains no inhibition to legislate on the subject of banks. The 15th section of the organic act declares: "That the Constitution and all laws of the United States, which are not locally inapplicable, shall have the same force and effect within said Territory of Nebraska as elsewhere in the United States, except the 8th section of the act, preparatory to the admission of Missouri into the Union, approved March 6th, 1820," &c. "It being the true intent and meaning of this act not to legislate slavery into," &c., "but to leave the people thereof free to form and regulate their domestic institutions in their own way, subject," &c., &c.

Upon the various statutory provisions above quoted, the first question which arises is: Does the act of Congress

of July 1, 1836, extend to Nebraska, that territory not being organized, and, perhaps, not inhabited at the time the act was passed? Considering the nature of the act itself, that it is as applicable to one territory as to another, as applicable and as necessary in 1854 as 1836; believing that it was intended as a solemn declaration of the policy of Congress on the subject in question, and being expressly made prospective, and it being in no way locally inapplicable, the Court are unanimously of the opinion, that the act of 1836 would, in the absence of provisions to the contrary in the organic act, be held to extend to the Territory of Nebraska.

The next question is: Is the act of 1836 impliedly repealed by the provisions of section six (6) of the organic act? A majority of the Court are of the opinion that this question should be answered negatively. And the ground for this opinion is, that repeals by implication are not favored (*Casey* v. *Harned*, 5 Iowa, 1; *Ament* v. *Humphreys*, 3 G. Greene, 255; *Harriman* v. *The State*, 2 Id., 270); and the two acts are not so inconsistent but that both may reasonably stand and have effect. One member of the court inclines to the opinion that by the legislation of 1854, it was the intention of Congress to invest the Territory of Nebraska with full legislative powers "over *all* rightful subjects of legislation" not inconsistent with the Constitution of the United States or the provisions of the organic act; that the subject of banks, being a matter of local and domestic concern, is a rightful subject of legislation, and that the act creating the bank in question, not contravening any provision of the organic act, was in force from and after its passage, approval and publication, without the sanction of a confirmatory act of Congress. In other words, that the Constitution and the organic act are the sole standards by which to test the validity of any act of the Territorial Legislature.

Of course, the Territorial Legislature had the right to take the initiative in legislation of the kind in question. They had the right to enact the law and have the same submitted to Congress, for its rejection or approval. But, in the opinion of the majority of the court, the act had "no force or effect whatever, until approved and confirmed by Congress." As Congress never sanctioned this act, it follows, in the majority view, that the organizing of the bank, the putting the same into operation, the issue of bills, in a word, the exercise of the powers and privileges conferred by the act, were without authority of law. Without quoting the numerous instructions of the court below on this branch of the case, we may say that this was the view which was there taken, and in this respect the record presents no error.

II. A large number of the instructions which were given for the defendant, and of which the plaintiff complains, related to the defense of *illegality* of *consideration*. As exhibiting the view of the District Court on this subject, we quote instruction No. 3, which was given to the jury at the defendant's instance: "No. 3. That all that part of the contract sued on which requires Pegram to redeem and cancel the bills of the Bank of Nebraska *is void*, and the said Pegram never has been bound by said contract to redeem or cancel said bills; and so far as the agreement binds Pegram to redeem and cancel the $9,000, and the other issues of the bank, he is not bound thereby." To which the court added: "Said issues being without authority of law and therefore of no value." Other instructions, and particularly those numbered 4, 5, 12 and 13, lay down, in substance, the same doctrine, and some of them expressly declare the contract in suit to be illegal. We cannot concur in the correctness of these directions to the jury, under the circumstances of the case. Their incorrectness can, it seems to us, be shown in a few words. Whether the bank was legally in existence or not, Allen being a stockholder in it and hav-

ing issued, given currency to, and received value for the bills, would be personally and individually bound to redeem them. If the bank was a legal one, Allen, as a stockholder, was, by the terms of the charter, individually liable for their redemption. If the bank was unauthorized, then Allen, who as president had signed these notes, issued and put them in circulation, would be personally answerable for their redemption. And this upon two grounds: 1st. As within the principle of *Tarbell* v. *Stevens & Co.*, 7 Iowa, 163, and *Taylor* v. *Cook*, 14 Id., 501: and 2d. Upon the familiar rule which will be hereafter referred to, that where there is no principal who can be made legally responsible, the agent who undertakes to bind such a principal is individually liable. It follows that Allen, being himself thus personally liable, might, for *a valid and sufficient consideration*, contract with the defendant to redeem the bills for him. He did thus contract with the defendant. The contract was not an *illegal* one; and if supported by a sufficient consideration (as to which more will be said hereafter), the defendant would be bound to perform that contract. It does not follow, as stated in the instructions to the jury, that because the bills were issued without authority of law, that *therefore* the defendant would not be bound by his contract to redeem the same. In short, this Court is of the opinion that there is nothing upon the face of the contract in suit which makes it void because of *illegality* of consideration.

III. Other instructions related to the defense of *want* of *consideration*. Without setting these out in full, as the judgment must be reversed, for the reasons above given, we will briefly indicate our views as to this defense. From the undisputed facts in the case, Pegram had a consideration, and a sufficient consideration, at least this far: 1st. He received the possession of the personal property, including the safe, if it was not a fixture, and has since

enjoyed the same without molestation. 2d. He received the conveyance of the real estate, upon which the banking house is situate, and, so far as shown, has uninterruptedly and peaceably enjoyed the same. But it is said that the deed, being made by the "Bank of Nebraska," an unauthorized corporation, was void, and conveyed no title. This may be admitted, and yet there was a consideration. The deed is, in substance, as follows: "The Bank of Nebraska, in consideration of $5,000, hereby conveys to B. R. Pegram the following real estate:" [then follows the description, after which the deed thus continues:] "And we do hereby covenant with said Pegram that we are lawfully seised," &c., "and we do hereby covenant to warrant and defend the said premises," etc. Signed (without any corporate seal) thus: "SAMUEL MOFFITT, Cash'r, "BENJAMIN F. ALLEN, Pres't."

It is possible, even if the corporation was in all respects a legal one, that the form of these covenants are such as to bind Moffitt and Allen as individuals; but it is not necessary to express an opinion on this point. In executing this deed, Allen and Moffitt purported to act as the officers and agents of the bank. The bank, owing to non-approval by Congress of the act creating it, would not be bound as a corporation. The well settled and familiar rule of law would then apply, that where there is no principal who can be made legally responsible, the agent who undertakes to act for and bind such a principal will himself be personally chargeable. One ground for this rule, and a sufficient one, is that, otherwise the party contracted with would have no remedy. *Winter, Adm'r*, v. *Hite*, 3 Iowa, 142, 143; *Stone* v. *Wood*, 7 Cow., 453; 1 Am. L. C., 602, 604; Dunlap's Paley's Agency, 374, and notes; *Barrett* v. *Jones*, 5 B. & Ald., 47; and *Thatcher* v. *Dinsmore*, 5 Mass., 299.

Conceding, therefore, that the deed of the real estate would not, *proprio vigore*, operate to convey title, or at least a perfect title in a court of law, still the defendant, as grantee, received a consideration in the covenants of Allen and Moffitt. Besides this, the transfer of the possession and use of the property, is a sufficient consideration. When a deed of real estate is made, if it contains no covenants, then, in the absence of fraud, all questions of title are at the risk of the grantee; if it contains covenants, the grantee must have recourse to them. This is the general rule, and it is recognized by prior cases in this court. *Brandt* v. *Foster*, 5 Iowa, 287; *Crocker* v. *Robertson*, 8 Id., 404; *Funk* v. *Creswell*, 5 Id., 62; *Merriwether* v. *Smith*, 2 Scam., 31; Rawle on Cov. for Title, Ch. XIII. And the purchaser, while in the peaceable and undisturbed possession of the thing sold, cannot withhold payment on the plea of want of title in his vendor. The reason is, *non constat* that he will ever be disturbed, and if not disturbed, his possession alone, which he received from his vendor, will ripen into a perfect title. 2 Kent. Com., 471, *et seq.*, and notes; also authorities above cited. If the plaintiff had a business established, and transferred this to the defendant, that would also supply a consideration. Questions in relation to the stock transferred, may or may not become material in another trial.

It is perhaps desirable that we should indicate our views on other questions which will most probably arise on a new trial. We do this with some reluctance, because some of them have not been discussed by counsel. What follows is to be regarded as the *prima facie* impressions, rather than the settled opinion of the Court. On the new trial, a question of the first importance will be the *subject matter of the sale and purchase*. It seems, from the testimony of the defendant, that the original contract in this respect was in writing, but it is not made part of the record, and is not before us. We can, therefore, express no opinion concern-

ing it. We have no means of knowing whether the trans-
action between the parties is to be regarded as a purchase
of the plaintiff's rights under the charter, whatever they
might be, and at defendant's risk as to title and value, or
whether it is to be regarded, among other things, as a
purchase of the stock, *eo nomine;* nor do we know whether
the contract was entire or severable; nor can we say whether
there would or would not be an obligation on the plaintiff
to the effect that the stock should be legally valid. All
these questions. will depend very much upon the actual
contract and the real understanding of the parties.

Bank stock is in the nature of choses in action as dis-
tinguished from choses in possession, and is personal pro-
perty as distinguished from real property. 2 Parsons on
Cont., 316; Angell & Ames on Corp., §§ 557, 558, 561;
Redf. on Railways, p. 38, § 40; Story's Confl. Laws,
§ 383. Mr. Williams treats of shares in corporations as
"*incorporeal personal property*," a very neat and accurate
designation. Will. on Pers. Prop., 155. Being personal
property, where it it is sold, and where there is nothing in
the contract or in the circumstances of the case to repel the
presumption, the vendor would be considered to warrant
its title, and that it was legally what it purported to be
in fact, but not its quality or its value. If no fraud was
practiced, and the real contract was an agreement on the
part of the defendant to buy the plaintiff's interest at his
own risk as to title and value, and in a lump, whatever
that interest might be, then the defendant's defense will
wholly fail. *Peck* v. *Boggess*, 1 Scam., 284. If the defend-
ant is, however, to be considered as a purchaser, *inter alia*,
of the stock, and the consideration has thus far failed,
whether this will be a defense *pro tanto* will depend upon
other considerations.

If the contract is severable (which we cannot determine),
then if the defendant, with reasonable diligence, upon ascer-

taining the defect in the charter, tendered back the stock and it was refused, and if he has not since disabled himself from keeping this tender good, the defense would thus far be available. If the contract was not severable or apportionable, then the defendant, in order to *rescind*, must offer with like reasonable diligence, to put the plaintiff wholly in *statu quo*, must tender back everything. In other words, if the contract was an entire one, the defendant could not offer to rescind in part. *Moore* v. *Bare*, 11 Iowa, 198, 204; *Walters* v. *Miller*, 10 Id., 429. But if, under the circumstances as they shall appear on the trial, the defendant was not entitled to rescind, or if this right, if it existed, was not exercised with reasonable diligence, or was waived, and especially if the defendant kept and enjoyed all that he received under the contract without an offer to rescind, or has put it out of his power to keep good any such offer by a sale and conveyance of the property and stock to others, then he is liable in law as he is in conscience and good faith to pay for what he has received and enjoyed. As to offer to return, see Story on Sales, § 203. As to subject matter of sale, failure of consideration, &c., see Id., ch. 5; 2 Kent, 468, *et seq.* As to entire and severable contracts, see *Miner* v. *Bradley*, 22 Pick., 457; *Parrish* v. *Stone*, 14 Id., 198, and cases cited; Story on Contr., §§ 22, 480, *et seq.* The above suggestions are made in view of the pleadings as they now stand.

IV. The defense as to fraud was submitted to the jury under instructions, which, as far as we have examined them, correctly state the law in this respect. If the jury found against the plaintiff on that issue, we have no hesitation in saying, having all the evidence before us, that the Court ought to have set aside their verdict. Indeed, if we read the testimony aright, the Court might very properly have refused to allow that issue to be submitted to the jury; for whenever essential or integral elements of a cause of action

Roseirz v. Van Dam.

or of a defense are wholly without proof, this Court will sustain the district courts if they refuse to allow it to go to the jury.

For the reasons above given, but chiefly because of the misdirection to the jury in regard to illegality of consideration, the judgment of the District Court is reversed, and the cause remanded.

Reversed.

COLE, J., being of counsel in this case, took no part in its determination.