ELIZABETH H. BETTENDORF, Appellee, v. JOSEPH W. BETTENDORF, Appellant.

**FRAUDULENT CONVEYANCES:** Fiduciary Relation. One who, while acting both as a managing officer of a corporation of which he was a stockholder, and as administrator of an estate, induces a widow to surrender to the corporation valuable properties belonging to the estate, and to cancel large claims held by the estate against the corporation, and pays nothing for the enhanced value resulting to his own stock holdings, is presumptively guilty of a fraud which renders him liable, on demand, to pay to such widow the value of such enhancement—a presumption which can only be overthrown by a clear showing that explicit disclosure was made to the widow of every material fact known to the administrator-manager, and not known to her, and bearing on the proposed action.

Evidence reviewed, and *held* that the presumption was strongly accentuated by the facts: (1) That the widow had but little knowledge of the affairs of the corporation; (2) that she implicitly relied on the administrator-manager and his representations; and (3) that the amount of the canceled claims and the value of the transferred property and the purpose of the transaction were materially misrepresented.

*Held,* further, that the presumption and the testimony in accentuation thereof were not overcome (1) by testimony tending to show that deceased never *intended* to enforce the claim canceled by the widow, and (2) by conflicting testimony that the widow was fully informed as to the extent to which the administrator-manager would be benefited by the gratuitous transaction.

**FRAUDULENT CONVEYANCES:** Administrator and Corporate President in Fiduciary Relation. An administrator who is also the managing officer of a corporation occupies a *dual* fiduciary relation toward the widow who is a stockholder in the corporation because of the stock holdings of the estate. If, while occupying such relation, he sees fit to buy the stock of the widow, he must thereafter, when faced with the charge that he paid an inadequate price, so explain the transaction as to clearly demonstrate the utmost good

faith on his part. This he can only do by showing: (1) That the price was, in fact, adequate; or (2) that, if it was not adequate, the widow knew it was not adequate, because he had revealed to her every material fact known by him and not known by the widow, including every material fact which he knew the widow was incapable of appreciating or discovering by an independent investigation of the books and affairs of the corporation. It necessarily follows that such presumption of unfair dealing becomes conclusive, on a showing that the price was unknown to the widow, grossly inadequate, and that she sold in reliance on the representations of the administrator-manager, which were materially misleading in their *contents* and *omissions*.

**FRAUD: Subsequent Declarations as to Value.** On the issue whether a trustee, in purchasing trust property of the trust beneficiary, was guilty of fraudulently misrepresenting the value of the property, the trustee's declarations, made 18 months after the purchase, and at a time when the property had not materially changed, tending to show a grossly larger value, are relevant and material.

**GOOD WILL: Rule for Computation.** *Arguendo*, the following rule is applied for the determination of the approximate value of the "good will" of a going concern, viz.:

1. Find the average annual net *earnings* for a fair and representative number of years.

2. Find the average annual net *investment* over the same period.

3. Deduct from the average annual net earnings a fair interest return on the average annual net investment.

4. The remainder will represent one year's earning of the non-physical part of the concern, or "good will."

**FRAUDULENT CONVEYANCES: Purchase by Fiduciary—Reliance of Third Party.** The plea of a fiduciary that the beneficiary, in selling the trust property to him, relied exclusively on the independent, impartial advice of a third party, must necessarily fall when it is made to appear: (1) That said third party, in giving advice to the beneficiary, relied solely on misinformation furnished *by the fiduciary;* (2) that said third party was so intimately associated with the fiduciary that he could not be and was not, in fact, an impartial adviser for the beneficiary; and (3) that the beneficiary, in selling, relied fully as much on what the fiduciary had represented to him as on the advice of said third person.

**COMPROMISE AND SETTLEMENT: Adjusting Part of a Fraud.** The victim of a fraud-induced contract with a *fiduciary* does not, by settling and adjusting one particular item of the fraudulent contract, debar himself from later maintaining an action for after-

discovered fraud permeating other parts of the contract, (1) when, at the time of such particular settlement, the victim was not in possession of any *fact* which would put an ordinary person on inquiry; (2) when his naked suspicion of further unfair dealing was promptly pacified; and (3) when the delay in bringing the later suit did not cause the fraud-doer to change his position.

**CONTRACTS: Affirmance in Toto(?) or Rescission in Toto(?)—Exception.** The rule that a party must affirm a fraud-induced contract *in toto* or rescind it *in toto* will not be applied in equity, when to so do would work an injury to innocent third parties.

**TENDER: When Not Necessary to Plead.** Plaintiff's failure, in an *equitable* action for rescission and general relief, to *formally* plead a tender of property received under the contract, in no wise lessens the jurisdiction of the court over the subject-matter; and the court may, in the interest of justice, decree such tender as a condition to granting relief to plaintiff, especially when the absence of such pleaded tender is never presented to the trial court.

**INTEREST: Conversion by Fiduciary.** A fiduciary who has fraudulently purchased the beneficiary's property for an inadequate price will be treated as having converted to his own use the difference between the price paid and the fair price, and will be charged with interest on such difference from the date of purchase.

SALINGER, J., dissents.

*Appeal from Scott District Court.*—F. D. LETTS, Judge.

OCTOBER 19, 1920

SUPPLEMENTAL OPINION DECEMBER 2, 1920.

THE plaintiff, widow of Wm. P. Bettendorf, recovered judgment against Joseph W. Bettendorf for $522,392.34, from which judgment he appeals. As her demand was for judgment in the sum of $3,000,000, she subsequently perfected an appeal, and may be referred to as appellee. Other parties were in the case, but nothing is now claimed against them.—*Modified and affirmed.*

*Lane & Waterman,* and *Cook & Balluff,* for appellant.

*Shepard, McCormick, Thomason, Kirkland & Patterson, Frank D. Thomason,* and *Albert W. Hamann,* for appellee.

LADD, J.—William P. Bettendorf died intestate, June 3, 1910. He left a widow, Elizabeth H., whom he had married September 9, 1908, his first wife having departed this life several years before. He was without children; but a father and mother, Michael and Katherine Bettendorf, and one brother, J. W. Bettendorf, survived him. Aside from household furniture, life insurance, patents, and royalties owed for their use, his estate consisted of 643 shares of the capital stock, consisting of 1,000 shares of the par value of $100 each, issued by the Bettendorf Axle Company. This property, other than such as was exempt to the widow, passed to the administrator, J. W. Bettendorf, who qualified as such a few days after decedent's death. No claims were filed; and, save the cost of administration, the widow was entitled to one half of the estate, and the parents to the other half.

The Bettendorf Axle Company was incorporated on January 1, 1895, with a capital of $500,000; $100,000 in common stock, divided into shares of $100 each; and $400,000 in preferred stock, issued as a means of borrowing money. Whether any of the preferred stock was outstanding at the time of the transactions hereinafter referred to, does not appear; and, as such stock was not referred to in defendant's propositions or argument, and as there was no suggestion of any mistake's having been made in omitting its consideration from the court's computation, it requires no further attention. Of the common stock, 355 shares had been issued to J. W. Bettendorf, 2 shares to others, to qualify them to act as directors, and 643 shares to W. P. Bettendorf. The enterprise developed rapidly, under the masterful guidance of the decedent, and, at the time of his death, the net value of the company's property, after all deductions, exceeded $2,000,000.

William P. Bettendorf was a man of inventive genius and marked constructive ability, a rare combination of qualifications for great enterprise. Throughout the growth of this company and development of the plant, he was the dominant and controlling spirit, even in matters of detail. He had begun life

as a clerk in a hardware store. For a time he was superintendent of a plow company. Having moved to Davenport in 1886, he began the manufacture of metal wheels; and, later on, having lost the management of this business, he turned his attention to making hollow metal axles; and to do this, the company was organized, as recited. This business expanded into the manufacturing of steel parts for railroad cars, out of which large profits were realized. The idea developed was that of working of sheet steel cold by the pressure of powerful hydraulic presses in steel forms or dies, and thereby producing steel brake beams, car bolsters, car underframes, cast steel trucks, and possibly other parts. These so differed from the parts then in use that some difficulty was experienced in disposing of the product; but the decedent, who planned all the necessary machinery, obtained orders by devising forms or dies or necessary machinery to produce parts meeting the ideas of the master mechanics of the several railway companies. He not only invented the several parts, but the mechanisms to produce them, and any changes therein to meet the whim or judgment of railway experts, required as a condition to contracting therefor. A large number of patents had been obtained by him, and others applied for,— over 100 altogether. He had entered into an agreement with the Bettendorf Axle Company, December 26, 1903, reciting that, under previous contracts, it was indebted to him, up to December 31st following, in the sum of $60,000, stipulating the payment thereof at the rate of $12,000 per annum, that said contracts were canceled, and that decedent—

"Transfer and set over to the party of the second part, and to its successors and assigns, the authority and license of applying and using the inventions and improvements described and claimed in any or all of said letters patent to the manufacture in the county of Scott, in the state of Iowa, and nowhere else, to the full end of the terms of said letters patent, respectively, of all kinds of wagons and wagon parts; also of all kinds of body and truck bolsters, car underframes, and car parts for railroad cars only, and to no other purpose; and of all of the aforesaid improvements in brake beams, and according to the designs as described and claimed in said letters patent, respectively; and to sell the same in any foreign country so long as,

and no longer than, said first party may remain the owner of foreign patents on said improvements and designs, respectively, or until he shall make other arrangements concerning the disposal of said foreign patents or rights thereunder. And first party does hereby further sell, transfer, and set over to second party a similar authority and license of applying and using all the inventions and improvements which may be described and claimed in any applications for letters patent of the United States which have been filed by him in the patent office of the United States and which relates to the manufacture of wagons and railway cars, or parts thereof; and further agrees that he will grant to second party a similar authority and license of applying and using all such inventions and improvements for which he shall at any time hereafter, while employed by the second party, during the existence of this contract, receive letters patent of the United States of America. It is now agreed between the parties hereto that the amount of the royalties or compensation to be paid by the second party to the first party, his heirs or assigns, for the right of the second party to manufacture and sell any or all of the articles which the second party may produce under the licenses herein granted to it by the first party, and also the compensation which the first party shall receive from the second party in addition to the salary, if any, which he may be entitled to receive as an officer of the second party, so long as he is actually engaged in and about the active management of the second party's business, shall be ascertained and paid as follows: 'If in any calendar year, commencing with the first day of January, 1903, the net earnings of second party from all departments of its business shall be more than sufficient to enable it to pay a dividend of seven (7) per cent for such year upon all the shares of its preferred capital stock outstanding, then thirty-five (35) per cent of the remainder of said net earnings for such year which may have accrued exclusively from the railway department of second party's business shall be paid to the first party by the second party.' If in any one calendar year there shall be no net earnings in excess of the amount necessary to pay a dividend of seven (7) per cent on all of second party's outstanding preferred stock, then the first party shall not be entitled to receive for that year any royalties

or extra compensation in excess of the salary of such office in said corporation which he may then hold."

Nothing had been paid decedent under this agreement, though, according to the computation of J. W. Bettendorf, $540,000 was owed him thereunder at the time of his death; while appellee contends that the royalties then amounted to $802,340.

Upon the petition of the plaintiff, J. W. Bettendorf was appointed administrator of the estate of decedent on June 8, 1910, and duly qualified. Though an inventory was filed, the appraisement was waived, at his instance, by the heirs of the estate. He was elected president of the company June 18, 1910, and, on July 9th, the widow and parents of the decedent entered into a contract with the company, by the terms of which the latter released a claim of about $122,000 which decedent had overdrawn on his salary and dividend account with the company, and the widow and parents relinquished all royalties mentioned. On the same day, the widow and parents transferred all letters patent held by decedent, and those applied for, to J. W. Bettendorf as trustee, with authority and obligation on his part to permanently license the company to make use thereof without exacting any compensation; and this he did immediately. These papers, of course, would not affect the relative proportions of the widow and parents in the patents and royalties; for the transfer enhanced the value of the stock in its entirety to the extent of the value of said patents and royalties, less the claim against decedent; but it resulted in increasing the value of the stock of J. W. Bettendorf to the extent of 355/1000 of such difference, for which he neither paid nor undertook to pay anything. In the latter part of May, 1911, he suggested to the plaintiff the purchase of her portion of the stock in the company; and, on June 1st, following, made a written proposal to pay therefor $431,252; and on June 7th of that year, she accepted this proposition, and on the same day, with the parents, in writing requested the defendant, as administrator of the estate, to make distribution of the shares and transfer the portion belonging to plaintiff, i. e., 321½ shares, to her. On that day, the administrator so did, reserving the right, "if necessary or advisable, during the period of administration of said

estate, to sell any of said stock for the purpose of paying debts against said estate for any other purpose whatsoever;'' and the shares were distributed by the administrator, and immediately transferred to the defendant accordingly. In this suit, the widow, as plaintiff, seeks to recover one half of the enhancement in value of J. W. Bettendorf's shares of stock, consequent on the release of the royalties for the use of the patents and the transfer of the perpetual use of the patents to the company, and the difference between the actual value of the 321½ shares of stock sold to him and the amount paid therefor. The ground for such recovery and the defenses interposed will appear in the further discussion of the case.

The trial court found the plaintiff entitled to judgment for $471,929.86, recapitulating the items as follows:

| | | |
|---|---|---|
| ''Par value common stock | | $100,000.00 |
| Surplus at date of stock sale | | 2,422,285.35 |
| Intangible value common stock | | 600,000.00 |
| Gross value common stock | | $3,122,285.35 |
| Deduct: | | |
| Account Shoal Creek investment | | 37,475.00 |
| Net value common stock | | $3,084,810.35 |
| Value plaintiff's 321½ shares | | 991,766.51 |
| Deduct: | | |
| Sale price plaintiff's stock | $431,252 | |
| Amount paid Feb. 8, 1913, | 50,000 | |
| One half of $122,000 overdraft | 61,000 | |
| One half of $104,000 owed by estate | 52,000 | |
| On value of house | 68,000 | 662,252.00 |
| | | 329,514.51 |
| Add benefit received by defendant's 355 shares from plaintiff's cancellation of royalties | | 142,415.35 |
| | | $471,929.86'' |

In these items, the "account Shoal Creek investment" was a depreciation or loss on realty; the item of "one half of $122,000 overdraft" was the claimed overdraft of decedent, heretofore mentioned; and the "one half of $104,000 owed by estate" was the widow's share of the amount expended in the construction of the dwelling house set apart to her. The item "on value of house" represented a discount allowed the widow in a general agreement between the parties.

I.    We first inquire whether plaintiff has been overreached in the several transactions involved; and, in doing so, it will be more convenient to take up the several transactions separately.

1. FRAUDULENT CONVEYANCES: fiduciary relation.    (a)   We have discovered in the record no reasonable justification of the release or waiver by plaintiff of her interest in the royalties owed by the company to the estate, without exacting from the defendant the payment of one half of the relative portion thereof which his stock bore to all the stock. It may be that the discharge of this large indebtedness was desirable, and possibly essential to the welfare of the company; but, to accomplish this, it was not necessary that plaintiff should make any contribution to the defendant, either directly or indirectly. For all that appears, had fair compensation been exacted of defendant for the benefit derived by him from such release, neither the company's interests nor prospects would have been affected or impaired thereby. The royalties so waived amounted to $802,340. One half of this claim belonged to the plaintiff, or $401,170; and this was turned over to the company by plaintiff without other compensation than the enhancement in value of the 321½ shares of stock held by her. In other words, Bettendorf received 355/1000 of this amount gratuitously, and solely on the specious pretense that the gift was essential for the protection of the Bettendorf Axle Company. The defendant computed the amount owed for royalties at $540,000. The discrepancy in amounts arises from different constructions of the contract between decedent and the company with respect to the payment of said royalties. Reverting to the excerpt therefrom above, it will be observed that it provides that, unless the net earnings from all departments exceeded enough to pay a dividend on the preferred stock of

7 per cent, nothing was to be paid decedent for the license of the patents; but "if, in any calendar year, commencing with the first day of January, 1903, the net earnings of said second party from all departments of its business shall be more than sufficient to enable it to pay a dividend of 7 per cent for such year upon all shares of its preferred stock outstanding, then the 35 per cent of the remainder of said net earnings for such year which may have accumulated exclusively from the railway department of the second party's business shall be paid to the first party by the second party."

The contention of the defendant is that the 35 per cent is to be computed on the remainder, after paying interest on the preferred stock, or the earnings of all departments; while plaintiff says that the computation was to be made on the net earnings derived from the railway department alone, after said payment of interest. That the latter is the correct construction seems too plain for argument. The language hardly could have been plainer than was employed. The "net earnings" are those which accrue "exclusively" from the railway department, and there is no room for construing the language to mean the net earnings from all departments. The evident design was to award decedent's remuneration on the more valuable patents, and eliminate deductions owing to loss in other departments,—and there were such losses almost continually in the wagon department. The defendant was hardly excusable in making the computation of royalties on the net surplus or profits of all departments, and representing to the plaintiff $540,000 as the sum total of all royalties for which the company was indebted to decedent. In fact, they amounted to $802,340, and she waived or released her interest in this sum over and above the $122,000 the decedent had overdrawn, which constituted a legitimate claim by the company against the estate. One half of this difference, or $340,170, plaintiff waived or canceled, and thereby enhanced the value of defendant's stock to the extent of 355/1000 of this amount. As said, the record affords no reasonable explanation of the gratuity to Joseph W. Bettendorf, then administrator of the deceased husband's estate and president of the company. Counsel for defendant undertake to defend this on the grounds that none of the royalties had ever been collected, nor had they

been entered on the books as debits of the company, and had not appeared in the company's statements, sent out to creditors or prospective creditors, and that it was not the intention of the decedent ever to collect these royalties. As the existence of the indebtedness is not questioned, we are not concerned with this situation, further than in so far as it may have influenced the action of the plaintiff. The condition of the books does not appear to have been called to her attention, nor does it appear that the circumstance that the decedent may have entertained an intention to cancel the indebtedness has had any influence on her action. C. N. Voss, who was appointed director to succeed decedent, at defendant's instance, first talked with the latter about the royalty contract, and pointed out the changed condition brought about by the fact that the title to the claim for royalties had passed to the widow and parents of the decedent, and suggested that the contract ought to be canceled. With Best, another director, they agreed, though recognizing the large benefit to accrue to defendant, upon the plan, and both defendant and Voss talked to the plaintiff concerning the cancellation of the claim. Both claim to have explained to her that the decedent never intended to collect these royalties, and, that they had never appeared in the statements sent out to the creditors. Voss suggested that defendant ascertain, from an examination of the books, the amount of the royalties. This defendant did, and explained to plaintiff, as he testified, "the amount of the royalties that had accrued, as he had figured it, and stated at the same time what W. P. had talked to me about as regards his intention not to collect;" and told her decedent never intended to collect the royalties under the contract; that these had never been referred to in statements sent out to creditors; and that he would be the only one benefited if these were not paid, because of the enhancing of the value of his stock thereby; and that she replied that that was perfectly satisfactory to her; and that she said, in her judgment, as he explained, that it was the only thing that could be done; that he informed C. N. Voss what he had done, and her attitude. Mr. Voss testified to having advised that the royalties indebtedness should be canceled, in the interest and for the protection of the company, and to having stated to plaintiff his understanding that decedent intended not

to collect said royalties; that plaintiff said, with reference to defendant's interest's being affected thereby, "Well, poor Joe, upon whom the whole load,—he has got to carry the burden of the business, and ought to have that little advantage, whatever it was;" and that she told him she fully understood the situation,—that is, she fully knew that the stock, the share of the stock that she would have in the company, would generally be just exactly what was given out. Mrs. Bettendorf admitted that she was told that her husband did not intend to collect these royalties, but was not aware that this had any influence on her, and testified, in substance, that she was told that, if payment of the amount due was enforced, this might break up the company; and that defendant "wanted above everything the concern to be prosperous, and the concern to be in good standing;" that she made no demands, because of being told that "it might break up the company, and I agreed to what they told me;" that she signed the waiver or release because the defendant wished it; that she "signed whatever they handed to me to sign, and upon their reading [that contract] to me, I signed that," perhaps not understanding; that she "wanted everything to be peaceful and in harmony, and many a thing I suppose I sacrificed for that," and because of the confidence she reposed in the defendant.

It will be observed that the amount of these royalties was represented to be $262,340 less than it really was, and that she was given to understand that payment thereof would jeopardize the credit of the company; that its business was poor, and the outlook otherwise not promising; and that she relied upon these representations. The defendant admitted that, upon signing the agreement, she remarked, "We must save the company," and further on, he was asked:

"Well, what did she say, when you first presented the matter to her, as to her judgment about canceling the royalties and the royalty contract; what was her first attitude when it was first explained to her? A. Why, she was perfectly satisfied, as I stated before. She said that, in her judgment, as I explained it, that was naturally the only thing that could be done."

Even though decedent had expressed the intention of canceling his claim to the royalties owed him, he had never done

so, and the record discloses no sound reason for the widow's making a large gift to the brother, which decedent is said to have contemplated, but, with ample opportunity, never made. Nor can the reasonableness of the royalties, in view of the large earnings of the company, be questioned. The record leaves no doubt that she had given the affairs of the corporation little or no attention; that she had reposed entire confidence in defendant; and that she was influenced entirely by his representation that what was done was necessarily for the protection of the company. If she expressed sympathy for the defendant, she does not appear to have been aware that he was then receiving a salary of $1,000 per month, to compensate him for the burden he was bearing. Voss also insisted that the letters patent should be assigned to the company; that this course was essential to its prosperity: and in this undoubtedly he acted in good faith toward the company, of which he was a director; for he had suggested the same, though without avail, to the decedent. Plaintiff testified that both Voss and defendant advised her that the patents would not be of any value to her; that they would only be a source of worry, annoyance, and expense, and the defendant told her that they might become involved in lawsuits. The matter, as seen, was finally adjusted by the transfer of the letters patent to defendant as trustee, with direction to license the same to the company perpetually. This, in effect, canceled the contract, and obviated all claims for future royalties.

That the patents were of great value to the company cannot be questioned. They constituted the basis of the enterprise, and enabled the corporation, issuing only $100,000 in common stock, to develop an enterprise which, during the five years previous to 1911, yielded an average net annual income of $660,283.33; and in eight years, assets of over $2,500,000 in value had accumulated. The defendant, then administrator of the estate, derived practically one third of the value of these letters patent without any compensation whatever. Their value will be considered in connection with that of good will. At that time, defendant was administrator of the estate, as well as president of the corporation. As such administrator, he held the legal title to these claims, and occupied a fiduciary relation toward the plaintiff. The existence of such relation be-

tween administrator and the widow of decedent is conceded by counsel for defendant. The authorities agree that an executor or administrator, dealing with those interested in the estate, must act in entire good faith, and owes the duty of truthfully advising them of all the facts bearing upon transactions between such executor or administrator and the interested parties. He might not deal with the widow and heirs at "arm's length," and indulge in arbitrary offers, even though known to be such; and doing so furnished no excuse for omitting full disclosure of the facts. Nor might he be the recipient of benefits from the widow or heirs through the influence of another, not acting for them, without such disclosure. We entertain no doubt that he failed to advise the plaintiff correctly with reference to the amount of royalties owed by the company to the estate; that the deal was made with reference thereto, and without explanation to plaintiff of the extent to which defendant would be benefited by the release of the royalties and by the contracts relieving the company from paying royalties on the patents in the future. This is apparent from her manifestation of sympathy for "poor Joe," who was being well paid for his services, and her characterization of what he was receiving as "that little advantage;" for she could hardly have thought a benefit running up into hundreds of thousands of little advantage, even to anyone thinking in large figures. Of course, if these patents were to be considered apart from their usefulness to the company, their value would probably be much less; but that would not be a fair way of considering them, nor can it be thought that either the defendant or Voss talked to them in this sense. They were fundamental in the development and continuance of the great enterprise. The profits earned in their use are indicative of their salability, apart from the company, for a large amount. We entertain no doubt that the defendant violated his duty as administrator in dealing with the plaintiff's interest in the property, in that he induced her to part with claims and property of great value, without any adequate understanding of the values with which she was parting; and this was due to his failure to bring to her knowledge explanation of the facts bearing thereon, and the extent to which the administra-

tor, as an individual, was profiting by the contracts which he induced her to enter into.

II.    As stated, the bulk of the estate of the decedent consisted of 643 shares of stock in the Bettendorf Axle Company, of which the widow was entitled to one half, and the parents of

<p style="margin-left:2em; font-size:small; float:left">2. FRAUDULENT CONVEYANCES: administrator and corporate president in fiduciary relation.</p>

decedent to the other half.  In the latter part of May, J. W. Bettendorf began negotiations for the widow's portion of this stock, and, on June 1, 1911, submitted to her the following written statement of the assets of the company, and proposition to purchase:

"Bettendorf, Iowa, June 1, 1911.
"Mrs. Elizabeth H. Bettendorf,
"City.
"My Dear Sister-in-law:

"Pursuant to our conversation in the matter of my purchasing your common stock interest in the Bettendorf Axle Company, I make the following statement and proposition:

"The surplus and common stock as of date of
    January 1, 1911, of the Bettendorf Axle
    Company being ........................$2,381,570
Deductions account depreciation, etc........   536,305

Net surplus and common stock ............$1,845,265

Your equity in the above as owner of 321½
    shares of stock being ...................$   593,252
Less ½ the amount the estate owes the Bettendorf Axle Company and which I will
    assume and agree to pay approximately..    52,000

                                          $  541,252
Deductions account of patent suits, part of
    your portion of the contingent liability..   110,000

Net amount I offer to pay.................$   431,252

I propose to pay you as follows:

| | |
|---|---|
| In cash ........................ | $150,000 |
| By Shaw Land & Timber Co. note | 50,000 |
| By Allen & Watkin's note ........ | 60,000 |
| Bettendorf Axle Company preferred stock ......................... | 18,000 |
| By my notes for 1, 2 and 3 years at 5¼ per cent per annum, secured by common stock of Bettendorf Axle Company, 321½ shares as collateral | 153,252 |

$431,252

"Respectfully submitted,
.''J. W. Bettendorf.''

°''Bettendorf, Iowa, June 1, 1911.

"I hereby accept the above proposition and agree to the terms thereof. Elizabeth H. Bettendorf.''

It will be observed that this offer was but $30,082 more than the royalties plaintiff had gratuitously assigned to the company, to say nothing of the value of the patents. But she accepted the offer, June 7th; and, on the same day, the widow and parents filed written application to the defendant, as administrator, requesting him to distribute the shares of stock to which they might be entitled, after exacting a written agreement that, if the administrator ''should find it necessary or advisable during the period of administration of said estate to sell any of said stock for the purpose of paying debts against said estate or for any other purpose whatsoever, that he, or his successor as administrator, may have the right to have possession of said stock. The first parties will upon demand deliver said shares of stock to said J. W. Bettendorf or his successor as administrator, or to pay value thereof to him or his successor upon demand.'' And on the same day, the plaintiff transferred her 321½ shares of the capital stock of the company to the defendant.

The record satisfactorily discloses that the price paid by the defendant was inadequate. The plaintiff was without information concerning the company's affairs, was unaware of the extent of its property, or what it had been earning and had in prospects in the business world. The defendant was fully

advised that she was relying, in large part or wholly, upon his representations as contained in the letter, and that she was acting largely, if not wholly, on the confidence she reposed in him. It is true, as argued by counsel for defendant, that decedent had been the dominating figure in the business, and, without his genius of invention and his business capacity, the enterprise might not have succeeded, and undoubtedly his demise interrupted its affairs and was an occasion of some misgiving as to the future of the company; but, during the 17 years of the company's existence, the defendant had been intimately associated with his deceased brother. Though possessing little or none of his capacity for invention, he was familiar with all the details of the manufacturing plant, and with the manner of doing business pursued by decedent; had been in charge of the plant always during the frequent absences of the latter; and, as was demonstrated shortly after the latter's death, was possessed of large business capacity, and was thoroughly qualified to succeed the latter, as he well knew. Indeed, it would be difficult for anyone to explain the contract entered into with the widow for the purchase of this stock on any other theory than that he had entire confidence, not only in his own capacity for the management of its affairs, but in the future prosperity of the corporation. Even his financial adviser, Voss, to whom the outlook is said to have seemed so dubious, could hardly have approved the transaction without having entertained confidence in defendant's ability, and in the future prosperity of the corporation. As it had earned profits, during the five-year period from 1906 to 1910, inclusive, averaging annually $660,283.33 on its common stock, it would seem to have been fairly successful in putting its productions, though then somewhat novel, on the markets of the world; and the defendant's confidence in the future of the company, as evidenced by his purchase of this stock, was well justified by its past record, and amply vindicated by what subsequently occurred.

On February 13, 1911, the directors, on motion of Voss, had increased the salary of the defendant as president from $12,000 to $18,000 per annum. Surely, this was done in recognition of his ability and the services he was rendering, and bespoke the confidence not only of Voss but of the other directors.

On July 11th following, 36 days after the above letter was written, the minutes of the directors of the company disclosed that the defendant, as president, "stated that, on July 1st, the company had business on hand to the amount of $1,283,915; that cash in bank was $279,078.60, and accounts receivable good for merchandise sold was $204,329.28, while there was owing for merchandise, etc., only $72,838.37, whereupon Mr. C. N. Voss offered the following resolution: 'Whereas, during the 17 years the company has been in business, no dividend has been declared on the common stock of the company, during which time a surplus of $2,422,285.35 has been accumulated, and under the very favorable condition of the finances of the company, as stated by President Bettendorf, be it resolved that the board declare a dividend of $300 per share on the $100,000 common stock of the company, and the notes of the Shaw Land & Timber Company, $50,000, and of C. R. Allen et al., $60,000, be applied in making payment of such dividend.' The resolution was unanimously adopted."

The defendant and others organized a corporation known as the Bettendorf Company, with capital stock of $7,500,000; and, on December 30, 1912, it, by its president, Joseph W. Bettendorf, filed application with the executive council for permission to issue capital stock in said sum, $5,000,000 in common stock and $2,500,000 in preferred, at 7 per cent cumulative, nonparticipative stock, representing that it had purchased the property, assets, and good will of the Bettendorf Axle Company at the price of $7,500,000, to be represented by the par value of the stock hereinbefore mentioned; that the factory, shops, and machinery were appraised as of date, February 1, 1912, by the American Appraisal Company, together with its balance sheet at the close of business November 30, 1911, and included the following "classified statement of assets:"

"Foundry, shops, power plant, other build-
ings, including machinery and appliances
(see Exhibit A) ...................$4,000,000.00

Real estate occupied by present plant, ap-
proximately 96 acres (see Exhibit B).. 192,000.00

Real estate adjoining plant, approximately
    145 acres (see Exhibit C) ............    145,000.00
Investments in bonds and stocks (see Ex-
    hibit D) ...........................    156,829.00
Patent development (see Exhibit E)....     61,902.00
Quick assets, consisting of material finished and
  in process of manufacture:
    Cash, bills receivable, accounts
      receivable ...............$2,155,848.00
    Less actual liabilities ...... 1,189,603.00

    Net (see exhibit F) .................    966,245.00

    Total ..........................$5,521,976.00
Patents, patent licenses and good will (see
    Exhibit G) .......................$1,089,713.00
Value of $15,000,000.00 of orders booked
    for 1913 delivery (see Exhibit H).... 1,300,000.00

    Total ..........................$7,811,689.00''

The petitioners represented that "the officers are thoroughly familiar with all the property, assets, letters patent, and good will of the Bettendorf Axle Company, and that it is in their judgment and belief that the said property and good will are fully worth the valuation as hereinbefore shown." This was sworn to by the defendant and Voss, saying that:

"We are familiar with the property, assets and business of the Bettendorf Axle Company of Davenport, Iowa; that we have each read the foregoing application of the Bettendorf Company to the Executive Council; that we have knowledge of the value of assets, property, patents and good will as classified and set forth in the foregoing application and that the values thereof as shown in the foregoing application are true and correct to the best of our knowledge and belief."

To this were attached certain schedules and estimates of values of the accepted property and good will.

From the evidence submitted, the executive council found the property to be of the value of $8,689,603, and that the out-

standing indebtedness of the old company was $1,189,603, which the new company was to assume, and authorized the issuance of stock to the amount of $7,500,000.

Of course, the value of the plant must be ascertained as of the date of the sale of the plaintiff's stock, and subsequent enhancement of values cannot be taken into account as bearing thereon. But this does not preclude the consideration of subsequent declarations by defendant and Voss, as bearing on the good faith and correctness of their previous representations to plaintiff, especially when there was no substantial increase in the physical estate. If the outlook for this was so unpropitious when plaintiff sold her stock, it must have brightened rapidly after defendant acquired it; otherwise, Voss could not have brought himself to have pronounced the condition of its finances very favorable, little more than a month later, nor, in view of his anxiety over the indebtedness for royalties, could he have consented to the voting of a dividend of $300,000 out of its assets, about $96,000 of which must have gone to plaintiff, but for the transfer, and, in less than a year and a half, swear that the plant was worth $7,500,000!

3. FRAUD: subsequent declarations as to value.

The explanation sought to be made is that these values were exaggerated, in order to obtain acceptance of the property equivalent to cash in the organization of the company; and, of course, there is no established criterion for estimating values of property. Between the low and top values, even when fairly estimated, there may exist honest differences of relatively large amounts. But where the estimates of practically the same property, at periods scarcely more than eighteen months apart, vary as one to three, or, in other words, the property is sworn to be worth three times what it was earlier represented to be, without suggestion of any cause for the increase, the mere difference of opinion as to value, or swelling estimates thereof for a purpose, furnish no adequate explanation. It is inconceivable that reputable citizens, even though possessed of large means, would thus exaggerate values of property on oath, even though this were done to induce those in authority to authorize the acceptance of property as equivalent in value to cash, in payment for the

capital stock of a corporation. Rather than say that defendant and Voss swore that this property was worth three times its value, in order to deceive and thereby induce the executive council to permit the issuance of capital stock in amount greatly in excess of its cash value, we are inclined to believe that the unsworn representations to the plaintiff were too low; and this will appear as we proceed.

Reverting to defendant's letter, it appears that he there represented the surplus and common stock, when that was written, to be $2,381,570; but, on July 11th following, Voss, in his motion that a 300 per cent dividend be declared, represented that the surplus alone was $2,422,285.35; and there is no pretense that this increased amount was due to additions made in the intervening 40 days. If to this is added the $100,000 par value of the common stock, the value of the property, as estimated by Voss at this meeting of the directors at which the defendant presided, was $2,522,285.35, or $140,715.35 more than defendant had stated such value in his letter. The figures probably were furnished by defendant to the directors, of which Voss was one, for defendant only was familiar with the books, and, in any event, the inference from his having accepted the dividend on this motion without protest warrants the conclusion that he approved the same. The discrepancy is nowhere explained satisfactorily. Again, in the letter, $536,305 is deducted on account of depreciation. The defendant testified that this was arbitrarily determined as the amount, and that he gave the figures making up this amount to Mr. Voss. His examination on the subject is quite illuminating. It appears that the company had purchased 186 acres of land east of its foundry, up to Duck Creek, and an old stone crusher, for which it had paid $160,000. The defendant computed $80,000 as a part of the above deductions on account of this real estate. He admitted that it was desirable to retain this land for the future development of the company, and his only explanation is that, as it was not required for immediate use, and was being leased at a low rental, he thought it ought not to be computed at the value paid. Notwithstanding this, and although the property had not increased

in value, it was listed as worth $1,000 an acre, in the application to the executive council, and this value was sworn to by himself and Voss.

It appears that, when the company purchased malleables, more than required for the particular job were bought, in order to meet emergencies of breakage and the like, and accounts thereof were carried in what was called surplus stock. After being carried for several years, they were put in the scrap heap, as new material came in. Deduction of $25,000 or $30,000 was made on this account, and without any investigation as to its correctness.

$25,000 was deducted on account of what is known as the Shoal Creek Company investment, consisting, as we understand it, of about $60,000 in bonds and stocks. There is no basis for determining the measure of discount which might properly have been made. The Bettendorf Improvement Company had been organized to purchase lots and to build houses for the employees of the company, and to handle the property. $92,529 was the amount so invested in stock, being issued at the par value of $100 per share for that amount. The deduction on this account was made on the apparent theory that defendant would not know whether the company would ever get all its money back. $33,000 was charged off on account of the Sargent car, though it was listed in the application to the executive council, and transferred to the new company at the price of $54,266.35, to which both the defendant and Voss testified, as being a fair value. Otherwise, this item has no explanation.

Again, the company had been conducting "a big test," to demonstrate the "rigid versus the flexible truck." Its competitors had undertaken by test to demonstrate that the company's principle of truck construction was wrong, and this test was made to counteract the effect of that made by them; and it was expending or expecting to expend certain sums of money on account of these tests. Manifestly, all this was done to aid in the future disposition of the company's output, and was not appropriate matter for deduction of $20,000 or $25,000. Other items were even more questionable. Indeed, defendant paid no

heed to his trust obligation to disclose the facts fully and fairly, but, according to Voss, "he had in mind to satisfy Mrs. Bettendorf, and show her, as near as he could, that he was justified in making those deductions,—those arbitrary deductions." The business had not been good during the early part of 1911, as compared with the previous year, and the company, during the first five months, earned a net profit of only $150,000, or more than 6 per cent of his estimate of the value of the plant; and so defendant figured off $50,000 or $75,000 as the probable loss of business during that year! His good or bad faith in so doing appears from the increase of $5,000 per month in salary in February previous, and the recital that business was prosperous, when, shortly after the purchase of the stock, a dividend of 300 per cent was declared! The witness was unable to recall other items, but these seem to have been noted on paper, of which a poor copy is attached to the abstract, and these seem without better justification.

The statement of the financial condition of the company of June 30, 1910, has a deduction of $929,419.13 as "reserve for depreciation," and it would seem to dispose of the items alluded to, especially that of the deduction "on account of the plant." We do not animadvert on the necessity of taking into account depreciation in estimating the value of going concerns. Every well-conducted factory or manufacturing company should make provision to cover wasted property and losses through exhaustion or obsolescence. If book deductions are too great, this is of little concern to the shareholders. Though the effect is to reduce dividends, actual value is not impaired thereby, and the surplus is increased. The amounts of deductions charged off a company's books, then, furnish little aid in ascertaining values. Depreciations other than those accepted by the trial court were without warrant, as must have been known to defendant, who was familiar with the books of the company.

The item of $52,000 was one half of the amount which had been withdrawn by decedent for the construction of his home, and was properly deducted. It will also be observed that $110,-000 was deducted on "account" of patent suits, "part of your portion of the contingent liability." This item does great

credit to the defendant's ingenuity as an expert in paring down values in order to mislead the unwary! It seems not to have been thought enough that she donate her one-half interest in the patents to the perpetual use of the company, about one third of which he thereby acquired gratuitously: he proposed that, in addition to this, she should also share in the expense of defending them, and this without including any estimate of the value of their permanent use in computing the value of the company's property!

The element of "good will" is entirely omitted from defendant's statement, as is the value of the patents. His explanation of the exclusion of these items but emphasizes the fact

4. GOOD WILL: rule for computation.

that his entire aim was to mislead as to the value of the stock, and that he felt himself under no obligation to make a fair statement of the condition and property of the company. Indeed, Voss describes the transaction as dealing at arm's length. That good will is an element of value proper to be taken into consideration in ascertaining the value of a going concern, is well established. *Millspaugh Laundry v. First Nat. Bank,* 120 Iowa 1; *Iowa Seed Co. v. Dorr,* 70 Iowa 481; *Thompson v. Winnebago County,* 48 Iowa 155. See *Crichfield v. Julia,* 147 Fed. 65. The value of good will varies with the facts of each particular case, depending on the extent of the use of the trade name, the stability of the business, consistent earnings, the character of the organization, the reputation of the concern, the personality of the manager, the possession of valuable patent rights, and all other elements which make for excess profits over and above a fair return on the capital stock invested. *Moore v. Rawson,* 185 Mass. 264 (70 N. E. 64); *Rowell v. Rowell,* 122 Wis. 1 (99 N. W. 473); *Feige v. Burt,* 124 Mich. 565 (83 N. W. 367); *Moffit v. Hereford,* 132 Mo. 513 (34 S. W. 252). It is always difficult to estimate the value of the good will of a business, and impossible so to do with accuracy. The following rule seems to have been approved by the courts of New York: (1) Determine the average annual net earnings of a fair and representative number of years; (2) determine the average annual net investment over the same period; (3) deduct from the average annual net earnings a fair interest return on the average annual net investment,

—6 per cent or 7 per cent; and the remainder represents one year's earnings of assets of the company other than physical assets, because a fair return on physical assets has already been allowed. It must, therefore, represent one year's earnings of the nonphysical portion, or good will. To determine the worth of the good will, therefore, this figure must be capitalized on a fair percentage basis, depending on the reasonable likelihood of continuance of such earnings. See *Von Au v. Magenheimer,* 126 App. Div. 257 (110 N. Y. Supp. 629); same case, 196 N. Y. 510 (89 N. E. 1114); *In re Silkman,* 121 App. Div. 202 (105 N. Y. Supp. 872); same case, 190 N. Y. 560 (83 N. E. 1131). The record discloses that the net income earned by the company each year for the five years preceding 1911 was as follows:

|  |  |
|---|---|
| In 1906 | $  452,176.58 |
| In 1907 | 586,079.80 |
| In 1908 | 278,740.49 |
| In 1909 | 1,134,276.50 |
| In 1910 | 850,144.30 |

Dividing the total amount of the several sums by the number of years, we have the average annual income of $660,283.55.

After deducting 7 per cent on the average investment, there would remain over $500,000 of the average annual income to be capitalized. Of course, such a computation is not conclusive, for other circumstances may have bearing on the productivity of the corporation, and its salability. Thus it appears that there was local uncertainty as to the future of the company; but its dealings were not local, save with the banks. Its credit with them appears to have been unimpaired. As one of the witnesses expresses it, "the railroad world was at a low ebb," early in 1911, but more of the company's share of orders was obtained later on. The business of furnishing supplies for railroads is shown to be subject to changing conditions of the companies, and varies greatly from year to year. The year was concededly a bad one until after July, and this may have affected the outlook of the enterprise. All these matters should be taken into consideration in estimating the value of the good will and

the perpetual use of the patents upon which the business of the corporation rested, as well as its prosperity in the past. As remarked by Emerson, ''Every successful business is the lengthened shadow of some one man.'' But such enterprises, however, do not ordinarily perish with the man who creates them. However large the sphere of human activity, someone is sure to take up the burden where laid down, and carry it onward, often with increased efficiency, as in the present instance, and sometimes at a loss. The business had been thoroughly organized, and there was nothing in the situation to indicate that the work would not be carried on. The net earnings of the company during the year 1910, notwithstanding the change of management during the last seven months thereof, amounted to ·$850,144.30, and, during the first five months of 1911, to $149,-366.67, or more than 6 per cent of the fair valuation of the physical property, leaving the earnings, if any, for the remainder of the year, in excess: that is, as additional income on the investment.

The record furnishes no basis for estimating the value of the perpetual use of the patents, save the income earned in the plant; though defendant and Voss, in their representations to the executive council, fixed their value at $1,089,713. Of course, this was 18 months after the sale, and their value may have been greatly enhanced in the meantime by the receipt of large orders; or the statement might have been intended to mislead the executive council. Surely, the perpetual use must have been worth something. At any rate, there was every reason to believe, in June, 1911, that the company would continue in business and continue to earn a large income, not only on its tangible, but on its intangible property as well; and we are of the opinion that the valuation of the good will and perpetual use of the patents at $600,000 by the trial court was very moderate. But for the peculiar situation at the time, the depression in business and other matters referred to, we should be inclined to largely increase the amount. The majority are not inclined to do so, and for that reason, we shall not interfere with the finding of value as made by the trial judge.

III. During the period when the contracts concerning the royalties and patents were entered into, and the plaintiff's por-

tion of the capital stock purchased, defendant was administrator of the estate of decedent. As such administrator, he held the legal title to the several properties in trust for the widow and heirs, and owed the same duty to them as trustees generally owe to their *cestuis que trustent*. As said by Judge Deemer in *Ryan v. Hutchinson,* 161 Iowa 575:

"Our Code expressly recognizes that an executor or administrator is a representative of the estate, and stands in law on an equality with a trustee of an express trust."

See, also, *Lampman v. Lampman,* 118 Iowa 140; 11 Am. & Eng. Encyc. of Law (2d Ed.) 986; *Cole v. Stokes,* 113 N. C. 270; *Herriott v. Potter,* 115 Iowa 648. An executor or administrator, in dealing with the estate and with those interested therein, is regarded as a trustee, and, as such, is subject to the principle which raises a presumption of fraud against him when he undertakes to purchase the trust property from his *cestui que trust.* Counsel for defendant seek to avoid the application of this rule by saying that the widow's portion of the stock had been distributed prior to its purchase by defendant. The record is to the contrary. All the negotiations occurred prior to June 7, 1911.

His written proposition to purchase was dated the first of that month, though Voss thought it was made earlier, and defendant fixed the date later. There is no dispute, however, that the acceptance was on the 7th; and, though the application of the widow and parents to the administrator for distribution, and his agreement thereto and the assignment of the stock, were dated on the same day, in the absence of any explanation, it may well be presumed that these occurred in the natural course of things, and therefore that the application for and distribution and the assignment of the stock took place subsequent to the negotiations. This is true, or else all these occurrences were part of the same transaction. In either event, defendant had not shaken off his trust relationship, prior to the purchase of the stock. Even were the proposition to purchase accepted after, but on the same day that the distribution occurred, the law would scrutinize with great care the transaction, in order to see to it that the *cestui que trust* had not been overreached. *Tucke v. Buchholz,* 43 Iowa 415.

There is another ground for saying that defendant stood in a trust relation toward the plaintiff in this transaction. He was a director of the Bettendorf Axle Company, and the president of that corporation. As such, he owed the duty, in purchasing her stock, to make a full and fair disclosure of any facts within his knowledge, bearing upon the value thereof, which he knew were not known to her, before taking over the stock. This doctrine was settled in *Dawson v. National Life Ins. Co.*, 176 Iowa 362. Appellant suggests that that decision might well have rested on the ground that actual fraud was perpetrated; and so it might, but it was designedly made to turn on the proposition stated, to which the court adheres. It is said, however, that this case is to be distinguished from that, for that the account books here contained all of the information possessed by the defendant, and therefore the widow might have ascertained everything known to the defendant by resort to said books. Appellant relies on this excerpt from the opinion:

"If the market or contract price of the stock should be different from the book value, he would be under no legal obligation to call especial attention to that fact; for the stockholder is entitled to examine the books, and this source of information, at least theoretically, is equally accessible to both."

This does not mean that an officer of a corporation may take advantage of a stockholder whom he knows to be uninformed concerning the condition of the books, and who is without appreciation of what they will disclose, and who is relying upon his statement of such conditions, which is misleading in what it contains, as well as in its admissions. Such deception is quite as much to be condemned as that of withholding facts not appearing in the record; and, under the facts of this case, the doctrine as to the existence of the trust relation between officer and shareholder is quite as applicable as in the *Dawson* case. Whether the defendant be held to the obligations of a trustee on the theory that the trust relation arose from his relation as administrator of the estate of the decedent, or from his position as director and president of the company, he owed to plaintiff the duty of dealing with her in absolute good faith. Because of relationship, the transactions reviewed are presumed to have been brought about by undue influence, and the burden was

and is on defendant to explain these, so as to be consistent with the exercise of good faith and fair dealing on his part. Ordinarily, this is shown by proof that all the facts within his knowledge were disclosed to the *cestui que trust*, and, if an inadequate price were paid, that this was fully understood by the latter, and acquiesced in. Evidence of inadequacy in prices raises a suspicion of unfair dealing; but this may be avoided by showing that the *cestui que trust* intended to sell at less than an adequate price, and thus, in effect, make a gift of the difference to the trustee. Another exception is where it is necessary that the *cestui que trust* sell without delay, and it appears that he had received offers of purchase at less than an adequate price, and had importuned the trustee to buy at the same or a higher price than offered, and the *cestui que trust* was aware of the sacrifice that was being made. In either of these situations, the sale cannot be interfered with because of the inadequacy of the price received. *Golson v. Dunlap*, 73 Cal. 157 (14 Pac. 576); *Cole v. Stokes*, 113 N. C. 270 (18 S. E. 321). In *Golson v. Dunlap*, supra, the court said:

"With respect to adequacy of consideration, no unbending rule applicable to all cases can be framed, because there are classes of cases which have features which prevent the operation of a fixed rule. The leading text-writers speak of adequacy of consideration as essential. See 1 Perry on Trusts, Section 195; 2 Pomeroy's Equity Jurisprudence, Section 958; 1 Story's Equity Jurisprudence, Section 311. Compare, also, *Grosvenor v. Sherratt*, 28 Beavan 663; *Edwards v. Meyrick*, 2 Hare *70; *Boyd v. Hawkins*, 2 Dev. [N. C.] 329, 331; *Coffee v. Ruffin*, 4 Coldw. [Tenn.] 515; *Rose v. Mynatt*, 7 Yerg. [Tenn.] 30; *Kisling v. Shaw*, 33 Cal. 425; *Rubidoex v. Parks*, 48 Cal. 215. But this is too sweeping. For there may be cases in which no valuable consideration at all is necessary. Thus, while a gift from a *cestui que trust* to his trustee is exceedingly difficult to sustain (see *Hatch v. Hatch*, 9 Ves. 292), it will, in proper cases, be upheld. See *Hunter v. Atkins*, 3 Mylne & K. 113; *Harris v. Tremenheere*, 15 Ves. 34, 39; *Marshall v. Stephens*, 8 Humph. [Tenn.] 159. The principle upon which such cases rest is, that it was the intention of the *cestui que trust* to part with his property without consideration; and, if a court of equity can clearly

see that such intention was induced by laudable motives, and not by want of knowledge of the situation, or by undue influence or deceptive arts on the part of the trustee, it will allow the intention to prevail. So there may be cases where, owing to special circumstances, it is necessary for the *cestui que trust* to sell without delay, and no one can be found who will buy, and the trustee, acting in entire good faith, gives more for the property than anyone else will give. In such case, it is for the interest of the *cestui que trust* to allow the trustee to buy, and it would be hard measure to set aside the sale merely because the sum which the trustee was able or willing to give was less than the value of the property,—the transaction being unexceptionable in other respects. It is too sweeping, therefore, to say that, in all cases, there must be an adequate consideration, if the word is to be used in any ordinary acceptation. On the other hand, the element of adequacy of consideration is most important. The great object of the rule is to prevent imposition on the part of trustees; and, in one sense, this may be said to be to prevent trustees from acquiring the property of their *cestuis que trust* for an inadequate consideration. To disregard the question of inadequacy, therefore, is to attempt to apply a rule while shutting one's eyes to its object and purpose. The writers above referred to are not very far out of the way in speaking of adequacy of consideration as essential.''

There was no evidence that, in making the deal, the plaintiff was aware that the price was inadequate. On the contrary, she was assured that it was all the stock was worth. There is no escape from the conclusion that the price was inadequate, and that the defendant omitted important matters from his statement, and included those that should not have been mentioned, and that plaintiff was induced thereby, without knowledge of the facts and the value of her stock, to part with it to defendant.

IV. The appellant contends, however, that the widow acted on the advice of C. N. Voss, and entirely disconnected herself from any reliance on the defendant. The fact of having obtained the independent advice of a third party does not alone obviate the presumption of the exercise of undue influence. It is merely a circumstance tending to show the *"uberrima fides"*

**5. FRAUDULENT CONVEYANCES:** purchase by fiduciary: reliance of third party.

of a transaction between the fiduciary and the beneficiary. The purpose of such proof is to establish the freedom of the *cestui que trust* from any influence or control of the trustee. This may be done by proof that the beneficiary acted on his own judgment, or solely on the advice of another. Manifestly, if either of these situations is established, the dominant party could not have exercised control in bringing about the deal between himself and the *cestui que trust*. The effect of this would be to obviate the presumption of unfair dealing quite as completely as proof that the *cestui que trust* was fully advised of all the facts, and, being *sui juris*, acted freely in dealing with the trustee. The force to be given proof of independent advice necessarily depends on whether the adviser has been put in possession of all the facts and circumstances, and, if not, whether the means of inquiry to ascertain these were at hand: in short, whether the adviser was so informed of the facts as that he might intelligently guide the *cestui que trust* in reaching a determination, and whether the *cestui que trust* relied entirely upon the advice given, in connection with what he may have known himself, and without placing confidence in the trustee. See *Curtis v. Armagast,* 158 Iowa 507, 527; *Cole v. Stokes,* 113 N. C. 270 (18 S. E. 321); *Korn v. Becker,* 40 N. J. Eq. 408 (4 Atl. 434); *Dunn v. Dunn,* 42 N. J. Eq. 431 (7 Atl. 842); *Nichols v. McCarthy,* 53 *Conn.* 299 (55 Am. Rep. 105); *Maas v. Lonsiorf,* 194 Fed. 577; *Zeigler v. Illinois Tr. & Sav. Bank,* 245 Ill. 180 (91 N. E. 1041); *Colton v. Stanford,* 82 Cal. 351 (23 Pac. 16). As pointed out in the last-mentioned case, if, at the time of the purchase, the trustee has shaken off his fiduciary character and the confidence which is presumed to have resulted therefrom, he is free to deal with the *cestui que trust;* and it matters little how this is done, whether because of the distrust of the latter, or his confidence in his own ability to conduct the transaction alone, or through the independent advice of a third person. If " 'the *cestui que trust* clearly discharges the trustee from the trust, and considers him as an indifferent person, he may purchase; but it must clearly appear that the purchaser, at the time of purchase, had shaken off his confidential character by the consent of the *cestui que trust,* freely given, after full information, and bargaining

for the right to purchase.' 2 Sugden on Vendors 693.'' Of course, if the alleged independent adviser is misled by the trustee as to the facts bearing on the transaction, or is in a situation such as to preclude impartiality, the adviser is in no better situation than the *cestui que trust*, and therefore would be laboring under the same difficulties, and proof of obtaining such advice would not be sufficient to rebut the presumption of bad faith. To be conclusive, the advice must come from a third person, disassociated with the transaction and the parties, so as to preclude the inference which otherwise might be drawn of interest in either one or the other, with relation to the transaction.

The record has not convinced us that Mr. Voss was in a situation to act as independent adviser with reference to the sale of the stock. He was not so disassociated from the interests of the trustees that he could well act impartially, and solely in the interest of the *cestui que trust*. He was asked whether he had acted as ''a sort of financial adviser of J. W. Bettendorf after the death of his brother,'' and answered in the affirmative. Nor does it appear that he had information other than that furnished by the trustee, on which to base his advice, save that coming to him as a creditor of the company, and as financial adviser of the defendant. Nor did he assume to base such advice as he gave on anything other than statements furnished by defendant, and the latter's written proposition to the widow. These were made out in response to his request for statements as to the condition of the company. Doubtless he had ascertained other matters as director of the company, and as financial adviser of the decedent and subsequently of defendant, but only in a general way, as bankers usually keep in touch with the trend of a debtor's business affairs. The record leaves no doubt that he made no personal investigation of the books or affairs or property of the company, but relied on the statements, including that contained in the written proposition, as did the plaintiff. Voss testified that, after some parley about arbitration, the plaintiff requested him to act for her in these negotiations; that he had many conversations with defendant, including some concerning deductions, and reported all of these to plaintiff, arranged with defendant that she should have the house, which was being constructed, for $65,000, instead of the $180,000

which she had agreed to allow; that he knew that the figures of the proposition were arbitrary; that he "never talked about the real value of that stock," for that "he didn't know what it was or might be;" that he tried to get all he could for Mrs. Bettendorf, and acted, in what he did, entirely for her interest; that it was difficult to say what the stock was worth, and, in considering whether she should sell, there were two questions: "First, whether the price offered is adequate for the commodity, itself; and second, her situation, and whether or not it would be expedient for her to sell." He finally wrote her a letter, referring to his discussions with defendant and to the difficulty "for anyone to fix a value and determine what the stock represented by a plant such as the Bettendorf Axle Company plant might be worth, unless the property were actually offered for sale as a whole.

"I have been reasonably conversant with the affairs of the company for years and having carefully gone over the statements made by J. W. B. in connection with his proposition and offer for your holdings made to you now, and fully recognize the uncertainties, fluctuations, and risks naturally attached to the business carried on and furthermore considering the fact that you are a minority stockholder, have no hesitation to recommend and advise you to accept his offer for the purchase of your interests. The price offered may be low and the deduction from book values insisted upon by Mr. B. may be excessive, in fact, future results may and it is to be hoped will demonstrate that it might have been better for you not to have sold. On the other hand, the amount which you will realize is a large fortune, and properly and safely invested will yield a nice income. A sale surely relieves you of tremendous and continued risk and anxiety, and it is for this reason mainly, and the further reason that you yourself can hardly expect to have a voice in the future management of the company that I have advised you to accept the offer."

On cross-examination, the plaintiff testified that she did not remember of ever having seen the original of this letter, until shown her at the trial. Even if she did,—and we are inclined to think it came into her hands,—it gave her no information as to the facts, and indicates that he possessed only figures fur-

nished by defendant. It was an argument based on plaintiff's situation, without reference to the extent of the property owned by the company, or its actual value.

Voss has been the financial adviser and friend of W. P. Bettendorf, and, upon his death, became such adviser of the defendant. Upon the latter's request, he succeeded decedent as a director of the company, and his first service in that capacity, apparently, was to advise the cancellation of its obligation to decedent's estate for royalties owed it by the company, estimated by defendant at $540,000, but, in fact, amounting to over $800,000; and that it be relieved from the payment of royalties on patents thereafter. According to his testimony, the alleged intention of decedent to cancel the indebtedness for royalties was explained to plaintiff, and "she replied that she knew," and that, concerning its effect on defendant's interest, she remarked: "Well, poor Joe, upon whom the whole load,—he has got to bear the burden of the business and ought to have that little advantage,"—the small sum being $284,830.70, or a contribution by her of one half of this amount, or $142,415.35! Voss must have known that, whatever may have been the intention of decedent as to making such a gift, he had not done so, and that the widow was under no obligation to carry it out; and that, whatever the explanation to her, she did not appreciate the amount owed, or the benefit being conferred on defendant. This was the first manifestation of the interest of Voss in the affairs of plaintiff! The second was in inducing her to part with all royalties on patents to be earned in the future, and perpetually part with their use. Talk of benefiting the credit of the company was well enough, but doing that did not necessitate contributing to the wealth of defendant of hundreds of thousands of dollars. It would seem that, to a real friend of this widow's, it would have occurred that fair compensation might have been exacted from defendant for a just proportion of royalties owed and to be earned in the future, in relieving the corporation of its burden of indebtedness.

Again, Voss knew that the letters patent had been assigned defendant and permanently licensed to the company, and were at the foundation of its great earning capacity; and yet he recommended the sale of the stock, without taking into consid-

eration the great value of the use of these patents, even consenting to a charge of $110,000 for their defense in the courts! Such was his impartiality as adviser! Nor was any attention given by Voss to the value of the good will of the concern. As a business man, he must have known that the good will of a business yielding an average net profit of over $660,000 per annum on capital stock of $100,000, with a plant of the estimated value of $2,500,000, was of great value. Even with all the doubts he entertained with reference to the outlook of the company, he does not seem to have been adverse to defendant's paying nearly a half million dollars for less than a third of the stock. In every instance, except the transaction wherein the price of the dwelling house was lowered, the advice of Voss was in the interest of the defendant. Undoubtedly, he negotiated with defendant concerning the purchase of the stock at her instance, but there are several reasons for saying that he cannot be regarded as an independent adviser: (1) He was too intimately associated with defendant, and could not well divest his interest in him in acting in behalf of plaintiff; (2) he relied implicitly on defendant's statements concerning the property, precisely as plaintiff must have done, and was misled by the misrepresentations and concealments of defendant, and, therefore, bad faith toward him in not making full disclosures was quite as effective as though plaintiff had negotiated directly with defendant; and (3) the evidence fails to show that plaintiff acted solely on such advice, but, on the contrary, leaves little or no doubt that she was influenced in what she did by her confidence in defendant and his representations. Voss seems to have acted merely as a "go-between," reporting all he learned to her. She was at all times aware that he had only the statements of defendant, and both relied on these! There is no escape from the conclusion that she relied quite as much on defendant's fidelity as on any advice received. It is difficult, in the light of this record, to find justification for the advice given this woman. If the business during 1911 was not good, this was due to a temporary situation: i. e., to the fact that the railway companies were not purchasing cars and other materials in any considerable quantities, owing to the rates of transportation fixed by the interstate commerce commission, and to the efforts that were being made to have these re-

duced. This but paved the way for larger orders in the future, and furnished no ground for expectation of permanent cessation in the output of cars, as subsequently appeared. If competition seemed probable, the company had met it before, to its great profit, and, for all that appeared, it would be able to obtain and take care of its share of the business in the future. There seems to have been no occasion for pessimism concerning the future of the company, though some local capitalists of ripe judgment seem to have shaken their heads. We shall not analyze their motives nor those of Mr. Voss in imparting his advice. A man of large interests, and greatly desiring the expansion and development of this enterprise, he might have thought this would be better accomplished with all the stock in Bettendorf's possession, and have exaggerated the disadvantages of a woman shareholder, ignorant of the company's affairs. He may have given some significance to the thought that she was sharing liberally in the estate, in view of the circumstance that she had been decedent's wife only two years. He talked with Best, a director of the company, and somewhat familiar with its affairs, who at first denounced the offer of defendant as much too low, but who, upon explanation by Voss that plaintiff was a woman, and unfamiliar with the affairs of the company, concluded that it would be all right. Thus both Voss and Best were inquiring concerning, not the fair value of the property and what she should be paid therefor, but what would be best for plaintiff in her situation; and even this much was based on not only lack of information, but misinformation and implied concealments on the part of defendant. Nor, as said, do we find that plaintiff relied solely on Voss's advice. She was asked:

"Did you think, at the time you accepted this offer to purchase your stock, that the offer placed upon the stock in this letter was all the stock was worth, according to Mr. J. W. Bettendorf? A. Why, I placed confidence in him to give me the right figures. I had no reason to doubt him, and no reason to disbelieve him, because I knew nothing. Q. Did you have anyone go over the books of the company for you? A. No, I did not. Q. Did you consult an attorney or anyone? A. No, sir, I did not. Q. At any time, from the death of your husband down until the time you signed this paper accepting his

offer to buy your stock, did you have a legal adviser? A. No, sir, I didn't. Q. Did you have any adviser other than J. W. Bettendorf, or perhaps Mr. Voss? A. Mr. Voss,—that was all. I remember, when talking with Mr. Voss at the bank about this offer to. purchase my stock, that he had figured on yellow paper. I did not read them: Mr. Voss read them to me, and it was very offhand. I don't know whether the figures Mr. Voss read to me were explaining this item of $536,000. It says here on this excerpt 'net surplus and common stock, $1,845,265.' I don't know now what is meant by 'net surplus.' I didn't understand at the time what was meant by the words, 'Your equity in the above as owner of 321 shares of stock, being $593,252.' I don't know the meaning of the word 'equity.' I must admit I was very dense. A fair explanation would have made me understand; but I didn't get it, so I didn't understand. I didn't ask for any explanation. * * * I naturally took for granted the figures he gave me was correct. Q. Well, didn't you have— do you mean to say that you never conferred or advised with Mr. C. N. Voss about how much you ought to receive for your stock? A. Why, the figures proved what I was to have for it. Q. When Mr. J. W. Bettendorf talked to you about buying your stock, didn't you go and talk to Mr. Voss about whether you ought to sell it or not, and how much you ought to get for it? A. I did not ask how much I was to get for it, but I did have a conversation with Mr. Voss in regard to selling out. Q. Well, wasn't it Mr. Voss who told you what Mr. Bettendorf's figures were? A. Yes, sir. Q. Well, now you were advised by Mr. C. N. Voss to sell your stock at the figure Mr. Bettendorf named? A. Yes, sir, I was. * * * Q. Well, didn't you then seek to advise with anyone about what the figures were? A. Why, Mr. Voss and I talked it over, and he figured out to me the amount of money that would be my yearly income. And Mr. Voss suggested in these words: ' "A bird in the hand is worth two in the bush." You had better take his proposition.' These are the very words he said. * * * I felt absolutely confident that what figures would be placed before me would be all right. * * * I expected, naturally expected, to get just what was coming to me. Q. Now, if you stop and think about it, you didn't believe Mr. Bettendorf just went ahead and

got up those figures without having any talk whatever with you about the price? A. I certainly did. ·He certainly got the figures of what I supposed always would be the right thing. * * * Q. Well, Mr. Voss did act in the matter for you, and did talk with you and advise with you about it, didn't he? A. Well, he did so, but I would not have objected to Mr. J. W. Bettendorf's attending to that. I didn't say anything. I didn't expect Mr. Voss to assume all of that, which, in a measure, he did, but I didn't expect it of him. * * * Mr. Bettendorf made a very few appearances at the time of the settlement, and, knowing that Mr. Voss was a gentleman whom I could talk with,—I needed someone to talk with. I know that I used Mr. Voss as a personal friend to talk matters with, but what the conversations were, I don't remember. Q. Now, don't you remember, Mrs. Bettendorf, that, when the figures did come to you finally, that they came to you through Mr. Voss? A. Well, the bank was the proper place for me to go to see. I expected Mr. J. W. Bettendorf there, but he did not make an appearance. Q. Oh, then you saw Mr. Voss at the bank, and talked about the figures that Mr. J. W. had submitted,—was that it? A. Had submitted. The figures were there, were submitted to me at the bank. Q. And that was the time when Mr. Voss figured out to you what your income would be if you sold at the price? A. If I sold at the price Mr. Voss figured out what my regular income would be? Q. Yes, and it was at that time that he told you you could not afford—out of that amount of money, you could not afford to buy the house at $180,000? A. Yes, that was the conversation we had at that time,—or at one time,—I won't say at that time; but at one time.''

Then follow the inquiries concerning the arrangement whereby she was to be released from the agreement under which she was to pay $180,000 for the house, and whereby she paid only $65,000 for it, and she testified that she did not think this was conditional upon the purchase of the stock; that she then supposed that she was entitled to the house as widow of the decedent; and that she accepted the figures that were put before her.

'Q. For what did you accept them? A. For my right, what was coming to me for the right of the estate, and for the

right of anything that might be due me. A. If you knew that Mr. Voss was director, would you regard him as a person who would look after, and upon whom you relied to look after, your interest? A. From a decidedly friendly standpoint. I supposed Mr. Voss was the only man whom I could talk with.''

This evidence as a whole indicates very satisfactorily that the plaintiff, in selling her stock, relied upon the representations and computations of the written proposition of defendant; and that throughout the transaction, she reposed quite as much, if not more, confidence in the defendant than she did in Mr. Voss. The former had been the close associate of his brother during many years, and enjoyed his entire confidence; and it is manifest from this record that the plaintiff relied entirely upon his integrity, and believed that he did have due regard for her interest in all the transactions between them. She had parted with her share of the claim to the royalties because of her confidence in him; she had signed contracts which avoided any liability for the future use of the patents on the part of the company; and, when he spoke to her about purchasing her stock, nothing had occurred to impair this confidence. She accepted his statements as correct, and, in dealing with him, relied upon him to tell her what the stock was worth, quite as implicitly, if not more so, than she did on the advice of Voss. The defense that confidence reposed in defendant was superseded by reliance on independent advice, was not made out.

V. Upon the filing of articles of incorporation of the Bettendorf Company, articles appeared in the local newspaper, commenting upon the new $7,500,000 corporation and the rea-

6. COMPROMISE AND SETTLE-MENT: adjusting part of a fraud. sons for the organization, and describing it as the largest incorporated company in the state. The plaintiff noticed these on the last day of the year 1912, and thereupon went to the office of Lane & Waterman, in Davenport, for the purpose of employing Mr. Lane; and, as he was away, she called on Mr. Voss, on the following day, in order to talk with him about the matter, and asked him to explain where ''all this money came from in such a short while,— the $7,500,000 for the company that was formed.'' Voss, in response, referred to the $15,000,000 order which the company had taken, and stated that ''there is always a lot of water con-

nected in a big transaction of this kind," and, according to the plaintiff, she was pacified by this explanation, and Voss testified that she seemed satisfied. She gave up the notion of employing an attorney. But she had previously talked about the item of $110,000 deducted in estimating the value of her stock for expenses of litigation over patents, and it seems that Voss was not quite satisfied with that part of the deal. Later on, an interview was had with Mr. Lane, as attorney for the defendant, who, without conceding any obligation, consulted his client, and it was subsequently arranged that she should be paid $50,000. A contract was thereupon entered into, bearing date of February 8, 1913, by the terms of which, after reciting the transfer of the stock, and that, in making the sale thereof, she was charged with "deductions account of patent suits, part of your portion of the contingent liability, $110,000," and some matters concerning litigation, and that J. W. Bettendorf desired to acquire all the rights of the plaintiff in the patents, and that Bettendorf was willing to pay $50,000 as an equitable adjustment of the above item and for the conveyance of her interest in the patents, the defendant undertook to pay the sum of $50,000, in consideration of which she agreed to "ratify and confirm the certain sale made by" her of her shares of common stock to defendant, and to sell and assign unto Bettendorf all of her interest in the patents, and she did assign same, and she elected to take 500 shares of preferred capital stock, instead of the $50,000 in cash. To effect the transfer of the several patents, she executed, at the same time, three other instruments. These instruments are pleaded by defendant as having confirmed and ratified the sale of the stock, and are said to have estopped her from now setting up the claims she asserts. The record shows that counsel for defendant insisted that, if she had any other claims, she must assert them at that time, so that everything could be finally settled. However, nothing was specifically referred to, except the item deducted on account of patent suits, and nothing was said concerning defendant's failure to make full disclosure to plaintiff concerning the facts bearing on the value of the stock in other respects. The mere circumstance that plaintiff's suspicion of unfair dealing had been aroused was not enough to charge her with knowledge of the facts, or to put her on inquiry with refer-

ence thereto. For all that appears, save in the one particular, she was as much in the dark concerning the conditions under which she sold the stock as at the time of the sale; and the authorities uniformly hold that, in such a situation, a purported settlement is not to be regarded as a ratification of a prior fraudulent transaction. Indeed, without knowledge of the facts, ratification would seem impossible. *Barton v. Fuson,* 81 Iowa 575; *Booth· v. Bradford,* 114 Iowa 562. The principle is well settled in 2 Pomeroy on Equity Jurisprudence (3d Ed.) Section 964:

"Wherever a confirmation would itself be subject to the same objections and disabilities as the original act, a transaction cannot be confirmed and made binding; for confirmation assumes some positive, distinct action or language, which, taken together with the original transaction, amounts to a valid and binding agreement. * * * If the party originally possessing the remedial right has obtained full knowledge of all the material facts involved in the transaction, has become fully aware of its imperfection and of his own rights to impeach it, or ought, and might, with reasonable diligence, have become so aware, and all undue influence is wholly removed, so that he can give a perfectly free consent, and he acts deliberately, and with the intention of ratifying the voidable transaction, then his confirmation is binding. * * * If, on the other hand, the original undue influence still remains, or if the act is simply a continuation of the former transaction, or if the party wrongly supposes that the original contract or transaction is binding, or if he has not full knowledge of all the material facts, and of his own rights, no act of confirmation, however formal, is effectual; the voidable nature of the transaction is unaltered."

Defendant contends, however, that the facts, as cited above, were sufficient to put her on inquiry, and that, had she followed up such clues as she knew of, she must have ascertained all the facts bearing upon the value of the shares of stock sold, and that, for that reason, she failed to act with reasonable promptness in bringing her action to rescind the contract of settlement.

Mere suspicion is not alone sufficient to put a person on inquiry. Such feelings as were excited in her were satisfied by Voss in explaining that earnings had been added and the stock

watered,—at least, Voss testified that she so appeared; and she gave no further attention to the matter.

The deduction of $110,000 on account of the patent suits had been talked of by Voss, as both she and her son testified, previously to her reading the article in the local paper and her talk with Lane. Only this item was discussed, but undoubtedly she asserted, in substance, that she made no other claim; for she was then ignorant of any facts entitling her to assert any, consequent on the indirection of the defendant in other respects. She was no better informed concerning the fraud practiced by not making full disclosure of all the facts,—as was exacted of defendant, both as administrator and president of the company, in buying the stock of her,—than at the time of the transaction. If her suspicions had been aroused, they had been pacified by Voss; and we have discovered in the record no clue which can be said to be such as would have put an ordinarily prudent person on inquiry. As said, mere suspicion is not enough, and she had no more than this at the time of entering into the alleged settlement, and even that was fully pacified. In these circumstances, the plaintiff must be held not to have estopped herself, by entering into the contract, from claiming damages consequent on the fraud perpetrated on her as widow and stockholder. It was not until she met the lawyer who had prepared all the instruments relating to the patents in the fall of 1914 that she seems to have given any thought to the matter. As a result of this interview, Thomason, an attorney, was employed by her to investigate, and advise her as to whether she had any claim against the defendant. He did so, and reported, in the early part of 1915, that she had "a good lawsuit;" and this action was begun in May following.

The Bettendorf Axle Company had transferred all its stock to the Bettendorf Company, newly organized in 1913, and the stock had been issued on February 23d of that year. No one could well pretend that she, as a person of ordinary diligence, must have asserted the facts prior to that time; and between that time and the beginning of the action the defendant's situation does not appear to have been changed, and such delay as there was, was not inimical to his interest. It may be that plaintiff was not fully advised, even at the time of beginning the

suit, of the facts bearing thereon; but she was informed by her attorney that conditions were such as that she might maintain an action. This was not a case where the fraud was perpetrated by parties dealing at arm's length: the plaintiff had a right to rely upon defendant, and was not at fault in not doubting the fairness of all his transactions; and we are of the opinion that it cannot be said that the plaintiff should be estopped by the contract of 1913 from claiming damages, or that she was guilty of laches, as contended by appellant, in delaying the prosecution of her cause of action.

VI. The court appears to have canceled that part of the contract of settlement which transferred plaintiff's interest in the letters patent, and to have confirmed that portion which related to the settlement of the $110,000 deduc-

7. CONTRACTS: affirmance *in toto* (?) or rescission *in toto* (?): exception.

tion, because of suits pending relating to the patents; and it is argued that it was without power so to do. Reliance is placed upon *Allen v. Pegram,* 16 Iowa 163, where, in an action at law, the court refused to permit a party to rescind in part and sue for damages. Here, plaintiff asked for the cancellation of the entire contract, and also that an accounting between the parties be had, and the true value of the patents be ascertained, and for such other relief as might seem proper. The evidence disclosed that it was impossible to put the parties *in statu quo,* as the interest of other parties had intervened, and therefore the transfer of the patents was allowed to stand, and defendant was required to account for the value when transferred. The assistance of the court in rescinding was invoked, and it was endowed with authority to enter such order as might be just to the parties. The principle is well stated in *Mills v. Morris,* 156 Wis. 38 (145 N. W. 369).

"Though, in general, one may not affirm in part and rescind in part, the rule is equitable, and ceases to operate where equity requires it to do so, as indicated in *Gay v. D. M. Osborne & Co.,* 102 Wis. 641 (78 N. W. 1079), *Ludington v. Patton,* and other cases. One must distinguish between situations where equity requires the rule to apply, and where it requires an exception; and also between an action for rescission and one based on rescission; also, between an action for rescission and an action to prevent injury where rescission would not furnish an adequate

remedy. One may retain the benefit of a contract and sue for damages because of a breach affecting it in part (*McConnell v. Hughes,* 83 Wis. 25, 53 N. W. 149), or affirm in part and rescind in part, obtaining a proportionate rebate in the purchase price, where some such course is necessary to conserve the real right of the matter. *Gay v. D. M. Osborne & Co., supra.* The court there said:

" 'The right of rescission of a contract for fraud, though a legal right, is based on equitable principles. Therefore, the requisites of its exercise should go no further than strict compliance which the dictates of good conscience requires. For that reason, the exception to the rule of total rescission indicated has become a part of our jurisprudence.'

"A proper conception of the real ethics of the law will enable one to perceive that rules are based on principles of justice and are limited by the effects in that regard. Therefore, when it is said that application of a rule to a particular situation would work injustice instead of justice, especially where the controversy is being dealt with in equity, wisdom will lead one to search for some recognized exception to fit the case, and, if none of the particular character can be found illustrated, to classify the circumstances within the broad principles that rules based on supposed necessities of justice are not to be applied beyond their reasonable scope."

VII. Finally, counsel for defendant contend that the plaintiff, in order to maintain the action, must have tendered the return of the $50,000 in preferred stock received by her, in consideration of the execution of the contracts of February, 1913; and that as no such tender was pleaded in the petition nor shown by the evidence, the petition must be dismissed. Were this an action at law, there would be much force in their argument. The matter of such a tender relates to the remedy, and involves the rule that one asking equity must show his readiness to do equity. The omission of such a tender was apparent on the face of the petition, and the omission was not referred to by demurrer or answer; and, according to the defendant's brief, the defect, if such it was, was not mentioned in the trial court. This latter contention is somewhat confirmed by the omission of any refer-

8. TENDER: when not necessary to plead.

ence thereto in the written opinion of his honor. To permit any
advantage to be taken at this time would indulge the practice
of nursing a masked battery, contrary to the approved methods
of open warfare. In such a case, the court may well deem the rule
in its strictness, requiring the adverse party to be placed *in
statu quo,* waived; or, in the interest of justice, the decree may
require the return of existent property to the *status quo,* as a
condition precedent to the recovery.

A like question was raised in *Ormsby v. Budd,* 72 Iowa 80,
where the court says:

"Defendants insist that, as plaintiff fails to tender, or offer
to pay, in his petition, these several sums, thus putting defend-
ants *in statu quo,* he is not entitled to any relief. Upon this
point, it is sufficient to say that defendants do not set up in
their answer the failure to tender these sums as a defense."

And further on:

"Defendants also insist that plaintiff's offer to retransfer
the stock is not sufficient. But no objection of this kind was
raised by the pleadings, or urged in the court below, so far as
we are able to discover. Plaintiff, in his petition, does not offer
to make the transfer of the stock. We discover no prejudice
which can result to defendant, if plaintiff file with the clerk of
the court proper assignments of the stock certificates, before the
reconveyance to him of the lands is made by defendants, or be-
fore the deeds to defendants are canceled. The decree should so
provide."

The point is touched upon in *Schneider v. Schneider,* 125
Iowa 1, where the contention was that a tender in open court
alone was not sufficient. The court held otherwise, saying that:

"In equity, a willingness and readiness to do an act is all
that is required; and, if the plaintiff be otherwise entitled to re-
lief, the court will not deny it simply because no profert in
evidence has been made of the subject of the tender, but will,
by its decree, if it be deemed necessary for defendant's protec-
tion, require the act to be done before the relief becomes effec-
tive."

See, also, *Clapp v. Greenlee,* 100 Iowa 586. The doctrine is
that, in case of a contract's voidability upon the ground of
fraud, the injured party must totally rescind it, and restore to

the guilty party all that he has received from him as a condition precedent to the maintenance of the action; for what he parted with is based on the thought that he may not retain what he has received, and at the same time insist upon restoration; for, in that event, he would occupy inconsistent positions, which the law will not tolerate. Such is the rule ordinarily applicable in actions at law, to which, however, there are exceptions. See *O'Brien v. Chicago, M. & St. P. R. Co.*, 89 Iowa 644; *Howard v. McMillen*, 101 Iowa 453; and other cases. It does not apply arbitrarily to actions in equity for the rescission of contracts; for therein plaintiff does not proceed on the theory that the contract has already been voided on the ground of fraud, but that the jurisdiction of equity is needed to accomplish that aim, and to give such incidental relief as he is entitled to. All that is essential in such a case is to show a willingness to do equity. The distinction is that an action at law is based upon a rescission; while, in equity, the suit is to effect a rescission,—that is, the court is asked to decree a rescission. In the latter case, it is sufficient for the plaintiff to offer to restore to the defendant what he has received in the petition, or to indicate in some manner a willingness to do equity, to submit to complete rescission, so far as practicable, and to make the defendant good for what was received from him in such manner as the court may direct. In such cases, the court has jurisdiction of the subject-matter and of the parties, and has the power to do equity between them. It may compel full restoration to the defendant *in specie*, so far as justice requires, as a condition for rescission, and may deny or give costs, having regard to the necessity of resorting to litigation for relief finally awarded. See *Ludington v. Patton*, 111 Wis. 208, 245 (86 N. W. 571, 582), where, after full consideration, the court remarked:

"If the complaint had not been so framed as to show such willingness, the defect could only have been reached by a demurrer for insufficiency on the particular ground that a cause of action in equity was not stated for the reason that plaintiff failed to show a willingness to do equity. *Taylor v. Fulks' Admr.*, (Ky.) 29 S. W. 349; *Ormsby v. Budd*, 72 Iowa 80; and *Newman v. Smith*, 77 Cal. 22."

The record leaves no doubt that the preferred stock was

still in the possession and control of plaintiff, and that it would not exceed in value the $50,000 agreed upon as a consideration; and undoubtedly, had the court's attention been directed to the matter, the decree would have been so framed as to require the deposit of the stock with the clerk, as a condition to the enforcement of the decree. Otherwise, the sufficiency of the petition to raise the issues passed on is not challenged by either party.

VIII. The trial court allowed interest on $142,415.35, charged defendant for benefit derived from the cancellation of royalties by plaintiff from date thereof, July 9, 1910, but denied interest on the additional $329,514.51 found due on sale of stock, June 7, 1911.

9. INTEREST: conversion by fiduciary.

The defendant acquired plaintiff's stock at that time, and has since enjoyed all the advantages of its ownership, and so manipulated it that restoration is impossible. There seems no good reason for denying plaintiff compensation for the use of the money which she should then have been paid for the stock, and which, through deception, defendant avoided paying. What happened was tantamount to the conversion of the deficiency in the purchase price by defendant in his trust capacity, and is clearly within the rule which includes interest from the date of conversion as part of the damages allowed. See *Doyle v. Burns,* 123 Iowa 488; *In re Estate of Young,* 97 Iowa 218; *Hook v. Payne,* 14 Wall. (U. S.) 252; *Ludington v. Patton,* 121 Wis. 649 (99 N. W. 614). The award is merely for the difference between what the fiduciary actually paid and what he should have paid for the stock; and simple interest thereon at the legal rate is not only just, as he has enjoyed the income from the stock, but adequate, inasmuch as the *cestui que trust* intentionally parted with said stock. The court erred in not including interest at the rate of 6 per cent per annum from June 7, 1911. The decree will be so modified as to require the deposit of the $50,000 worth of preferred stock received by plaintiff, together with dividends received thereon, with the clerk of the district court for defendant, immediately upon the deposit by him of $50,000 with that officer, with interest thereon at the rate of 6 per cent per annum from February 13, 1913, for the use of

plaintiff, within 60 days from the filing of the opinion; also, the addition of interest, as stated, to the amount for which the judgment was entered; and the judgment, as so modified, will bear interest from the date entered in the district court.—*Modified and affirmed.*

WEAVER, C. J., EVANS, PRESTON, STEVENS, and ARTHUR, JJ., concur.

SALINGER, J. (dissenting). Like the majority, I find it conducive to clarity to deal separately with the several claims of the plaintiff.

In pleading false representations and *scienter*, plaintiff has assumed an unnecessary burden. A fiduciary relation existed between her and the defendant at the time he bought her stock, and therefore the burden is on him to show that he dealt fairly with plaintiff, and neither misrepresented any material fact nor failed in any duty to make full and fair disclosure.

The representations and failure to make disclosure charged in connection with the purchase of the stock are three: (a) The writing of an offer to purchase the stock; (b) deductions demanded on account of depreciation and other matters; (c) representations charged to have been made as to the condition of the corporation at and immediately before the time the stock was purchased.

There is further complaint that defendant dealt unfairly with the plaintiff in connection with the transfer of patents owned by the late husband of plaintiff, and in obtaining release from royalties due.

The reasons that impel me to make emphatic protest against the conclusions reached by the majority, I shall state first by way of propositions. Some of these will need no elaboration, and be self-proving. Others will be followed up by such amplification as will present the reasons for stating the proposition.

I. A naked offer to purchase at a stated price, with declaration that no more will be paid, which offer is made after values are fixed by an agent of the seller's own selections, is neither an actionable representation nor a breach of duty to make disclosure.

II.  Where deductions for depreciation and the like are made in a written offer to buy, confessedly made and understood to be arbitrary, such deductions are not more than another way of stating what the highest price is the buyer will·pay, and are neither an actionable representation nor a failure of duty to make full disclosure.

III.  A statement by the agent of the seller, after the sale is concluded, that the property is worth more then than the seller paid for it, is, in the first place, not binding on the defendant, because not made by his agent, and can, at any rate, add nothing to the written offer, nor put a representation into it that is not found in it.

IV.  The fact that one who is not the agent of the defendant declared, some 40 days after defendant offered to buy, that the property, when bought, was worth substantially more than at the earlier time, does not prove against defendant, if it be evidence at all, what the value was at the earlier time.

V.  That a buyer, some 18 months after buying stock, states to the executive council that the property is worth much more than he said it was worth at the time he bought it, 18 months earlier, is no evidence of what it was worth at the earlier time,—especially where it is explained that the enlarged value was fictitious, in order to obtain favorable action from the council.

VI.  An alleged representation as to the condition of the corporation in which plaintiff sold stock is not proved to have been made.  If made, it appears affirmatively that it was true.

a.  The majority concedes that said representation was true when made, but holds the defendant responsible as for a false representation or failure to disclose, because unanticipated conditions made the business better in future than it was at the time when defendant purchased the stock.

b.  There is no liability for false representations or breach of duty to make disclosures, merely because a buyer of stock is not a prophet.

VII.  Since Voss was the agent of plaintiff's own selection, and conducted all the negotiations, his knowledge is the knowledge of plaintiff.  And as there is no claim that he himself was overreached, and as the evidence shows he himself

had full knowledge, there was no duty on defendant to make disclosure to plaintiff. His duty to disclose was limited to disclosing to Voss, and Voss needed no disclosure, because he was already fully informed. This is the holding of *Birks v. McNeill*, 185 Iowa 1123. That case disposes of *Dawson v. National Life Ins. Co.*, 176 Iowa 362. The *Dawson* case is cited by the majority, but the *Birks* case is not so much as mentioned.

VIII. Where one refuses to deal, or to fix values for property, except by having an agent of the seller's own choosing fix the valuation, it cannot be said that she relied upon a fiduciary relation, existing between the seller and the proposed buyer. The very choosing of such agent is a refusal to rely on the fiduciary relation.

IX. For, whatever it comes to, the majority is mistaken in saying that plaintiff relied as much, if not more, on defendant than on the advice of Voss.

a. Assuming that Voss is not a competent, impartial, and independent adviser, and it takes certain defenses away from defendant. But it does not take away the right to say that one who refused to fix valuations and appointed an agent to fix them therefore relied on the agent, and not on the buyer. There was no reliance on the alleged representation as to the condition of the business, because plaintiff testified that the same did not influence her "any."

X. Whether an agent fall within the independent adviser rule or not, one who buys through him from his principal is not responsible for any negligence or misconduct on the part of such agent. The majority deals with this case as though it were a suit against Voss for having broken his duty as an agent. It is not such suit, and nowhere, except in the majority opinion, is the competency or good faith of Voss challenged. At no point is it claimed that he and defendant were in collusion.

XI. Plaintiff had reasons of her own that induced her to sell, and retire from the corporation; therefore, she did not rely on defendant, or on the fiduciary relation between them.

XII. No inadequacy is shown, because the property sold was highly speculative. As to such property, adequacy is determined by what it could have been sold for to others for cash.

XIII. There was no inadequacy, because the only wrong

complained of is with reference to obtaining "common stock." As there were four shares of preferred stock to one of common, each share of the latter transferred only one fifth of a share in the property of the corporation. A price that may be inadequate where paid for a given thing is not inadequate if it buys only one fifth of that thing.

XIV. Where one believes he has been defrauded in making a sale, and seeks to employ counsel, refrains from proceeding to follow up the knowledge and belief, and to ascertain how much injury has been done by the alleged fraud, and accepts a substantial sum for a release, such settlement is binding though it was made in ignorance of how injurious the fraud had been. If it were otherwise, the statute of limitations would never begin to run until the wronged party had seen fit to ascertain finally the extent of his injury.

XV. There was no fiduciary relation when the settlement was made.

XVI. The settlement included all claims, and not merely the one item of $110,000, deducted for possible patent litigation.

XVII. This is not a case of mere suspicion that does not put on inquiry, but is an accepting money after being told to assert all claims once for all, and after believing that plaintiff had been overreached. It is not a case of mere suspicion, but of deliberate refusal to proceed to the end with knowledge obtained, taking the money of the other party, and then claiming more, because plaintiff concluded later to ascertain what she could as well have ascertained before consenting to settle.

XVIII. This is not a case of laches in delaying suit. It is a case where the suit, no matter how timely brought, cannot be maintained, because, with means of knowledge at hand, and in the belief that she had been wronged, plaintiff released all damages, for a substantial consideration. It is not a case of delaying suit, but of trying to collect damages in piecemeal, and for an additional payment every time the claimant sees fit to make further investigation and claim more on the alleged discovery of more damage.

XIX. Granting there may be cases in other jurisdictions that held otherwise, in my opinion it is settled by *Allen v. Pe-*

*gram,* 16 Iowa 163, that the court may not, even in a suit in equity, permit a party to rescind in part and then sue for damages.

XX.   Releasing royalty claims due the late W. P. Bettendorf worked no fraud on the plaintiff; and the release was, at all events, wholly at the instance of Voss, without interference by defendant; and Voss was never the agent of defendant; and the advice given was sound.

I shall now proceed to such amplification as I deem demanded.

1.   Defendant had no negotiations with plaintiff, except to inquire of her whether she cared to sell her stock.   To carry on the negotiations, and to ascertain values, plaintiff, of her own volition, selected Voss.   No attack is made either on his integrity, diligence, or competency, except such as is made in the majority opinion.   And let me say, in passing, that the trial judge, who is a member of the community in which Mr. Voss has made his enviable standing in life, makes a finding that Mr. Voss is a man of unimpeachable integrity.   Be all that as it may, there is no warrant for dealing with this suit as though it were brought against Voss, asserting misconduct, or brought against Voss and defendant, asserting collusion.   There is no such suit, and, as said, there is no such claim, so far as the record is concerned.

After Voss was made agent, he did negotiate; he did reach a conclusion as to values; and finally, the defendant wrote a proposal to buy, which makes reference to the former conversation, in which inquiry had been made of plaintiff as to her willingness to sell, and in which she had expressed a willingness.   Aside from this reference, the letter was this:

"I make the following statement and proposition:

The surplus and common stock, as of date
of January 1, 1911, of the Bettendorf Axle
Company, being ......................$2,381,570
Deductions account depreciation, etc. ......   536,305

Net surplus and common stock ............$1,845,265

Your equity in the above as owner of 321½
  shares of stock being ....................$  593,252
Less ½ the amount the estate owes the Bet-
  tendorf Axle Company and which I will as-
  sume and agree to pay, approximately....    52,000

                                                    $  541,252
Deductions account of patent suits, part of
  your portion of the contingent liability..  110,000

Net amount I offer to pay ..............$  431,252
"I propose to pay you as follows:
In cash .......................$150,000
By Shaw Land & Timber Company
  note ........................  50,000
By Allen & Watkins note ........  60,000"

This letter is merely an enumeration of what the offerant is considering in making the offer, plus true statements of what was on hand in the way of capital stock and surplus, plus the steps in computation, and its close is the statement, "net amount I offer to pay." It should not be said to be either a representation or a breach of duty to make disclosure, and the plaintiff herself pleads that the letter in question was merely a declaration that the price named in the written proposal was the largest price that defendant would pay.

No matter how reasonable or unreasonable such an offer is, it is nothing actionable to make it.

The receipt of the Voss letter is *not* denied by the plaintiff, but by her attorney, and the majority is mistaken in treating the receipt as denied, and so the presumption of due delivery overcome. All the plaintiff does is to say she has no recollection of having received this letter. (Abstract 1012.)

Though the written offer does not mention good will, neither does it mention that the corporation had a manufacturing plant. And when Voss, the agent of plaintiff, advised her to accept the offer, he knew that good will was not mentioned in said letter, and what the true values were.

Whether Voss was or was not within the rule governing in-

dependent advisers, whatsoever he communicated to plaintiff *against* the offer of defendant certainly is to be considered on how the offer was understood by plaintiff. She must have understood it was an arbitrary offer, for Voss had written her, advising acceptance, in connection with which he said:

"The price offered may be low and the deductions from book value insisted upon by Mr. B. may be excessive, in fact future results may, and it is to be hoped will, demonstrate that it might have been better for you not to have sold."

Having been advised that the offer was too low, and that the deductions were excessive (although it happens to be the fact that the charge off made in the lifetime of plaintiff's husband was larger), no relief may be had because the offer was unjustifiably inadequate. *Colton v. Stanford,* 82 Cal. 351 (23 Pac. 16, at 20).

As to the $110,000 for the item of possible patent litigation expense, it is but necessary to say that this item was an arbitrary demand for deduction, made in the offer to buy.

The fact that, 11 days after the date of the written offer, Voss declared, at a meeting of the board of directors, that the surplus and common stock were worth $140,715.35 more than the figures found in the written offer, is an immaterial fact: First, because nothing said by Voss after the letter was written can add a word to that letter, or put a representation into it that is not there; second, Voss, being the agent of plaintiff, and not of defendant, cannot bind the defendant with this or any other statement.

It is immaterial that Voss, 41 days after defendant made his offer, and 34 days after his acceptance, offered a resolution at a directors' meeting, presided over by defendant, wherein he asserted that a large surplus had been accumulated, and that, therefore, a large dividend should be declared. If Voss misconducted himself in advising plaintiff, the remedy lies in a suit against him, or one against him and defendant; and plaintiff does not charge Voss with any wrongdoing, nor claim that he acted in collusion with defendant. Second, as to this assertion by Voss, it must be repeated that he was never the agent of defendant.

If defendant is to be affected, it must be because he accepted the dividend declared. But, as there is no evidence that when, at the earlier time, he offered to buy, or bought, he knew what Voss asserted in the later meeting, the acceptance by defendant is no evidence that, when he bought, the stock was, or that he knew it was, worth more than he paid for it.

To hold that the application to the executive council involved no padding is proving too much. If the majority rejects the explanation of defendant, then it is confronted with being compelled to hold that, 18 months earlier, the property was worth substantially what the council found it to be. It found it to be of the value of $8,689,603. It deducted indebtedness which the new company had assumed, in $1,108,603, and then authorized issuance of stock to the amount of $7,500,000. Is it possible that what was valued at a little over $2,000,000 at the time the stock was sold was, instead, worth $8,000,000? So to hold, overlooks that other statement of the majority opinion that, when Voss moved the declaration of a dividend, only 41 days after the offer was made by defendant, the enhancement then was but $140,715.35.

It seems fairly plain that the verification of the application made to the council, while it weakens the credibility of defendant, if there were need to make a test, is no evidence whatever that, even if he had not dealt with the agent rather than the plaintiff, he did anything actionable when he bought.

2.   Under the rule of *Birks v. McNeill*, 185 Iowa 1123, the plaintiff should not be allowed to recover anything, because she dealt through an agent who had full information, or the means of getting it, as to the value of the property sold. This case the opinion does not as much as mention. The headnote (in the Northwestern Reporter) in the case is:

"Where plaintiff made an officer of the corporation in which she owned stock her attorney in fact, *held* that the president of the corporation, though he was the brother of plaintiff's husband and the executor of his will, was under no duty to explain to plaintiff the value of the stock before purchasing it on a proposal submitted by her attorney in fact."

It appeared that the attorney in fact had been a director in the corporation, and had, at one time, been secretary and mana-

ger. We point out that this agent "seems to have placed much reliance upon the reports coming in to McNeill Brothers Incorporated, and upon its books, and he testified therefrom in connection with his inspection of the several properties." We say, that, without reference to what the agent may, in fact, have known:

"The books were open to his inspection quite as freely as to the president of the corporation. * * * He either knew or had quite as good an opportunity for ascertaining the value of these several properties as did the president. * * * We are not saying that he actually knew what the several properties were worth. * * * We are inclined to the view that she is in no better situation and cannot be heard to complain of the omission of McNeill to advise her agent concerning the condition of the company."

*Dawson v. National Life Ins. Co.*, 176 Iowa 362, now relied on by the majority, was urged in the *Birks* case, but that did not seem to affect the result reached.

This case is fairly within the holding of the *Birks* case. Though the opinion, in a way, challenges the fact, the record demonstrates overwhelmingly that Voss had as much knowledge, or means of obtaining knowledge, as had the agent in the *Birks* case. Beyond question, Voss had full knowledge of what the condition and assets of the corporation were, and what the stock was worth; and he knew what the offer omitted in, say, stating good will. If he and his knowledge bind plaintiff, there is no breach of duty to make disclosure. The disclosure was due the agent alone, and the principal can gain nothing on the ground that there was a failure to disclose to the agent what he already knew. Voss got his knowledge first through the late husband of the plaintiff, and from statements made by the decedent. He got further knowledge because his bank was financing the corporation, and he had to investigate its standing constantly, and compare its development and success with that of other like institutions, in order to determine what credit should be extended, and he obtained knowledge by becoming a director, attending meetings of the board. He sums it all up that his knowledge "became practically full and complete."

What all this comes to is that plaintiff should not prevail, if her agent had knowledge or means of knowledge of the value of the stock offered for sale. *Colton v. Stanford*, 82 Cal. 351 (23 Pac. 16, at 20, 21) ; *Cardoner v. Day*, 253 Fed. 572, at 585.

What would have to be said if there were claim or evidence that defendant overreached Voss, or that the two were in collusion, is not important, where there is no such plea and no such evidence. In their absence, the *cestui* is bound by the knowledge of her agent; and as to him, there was no duty to make disclosures, because, following the *Birks* case, he already knew everything that defendant would have been able to disclose to him. See *Korn v. Becker*, 40 N. J. Eq. 408 (4 Atl. 434) ; Bigelow on Fraud, 263, 264; *Moxon v. Payne*, L. R. 8 Ch. 881.

3. It is charged that defendant fraudulently (Paragraph 33) represented that the affairs of the company were in poor condition, and its business unprofitable; and that he grossly misrepresented the condition of the company at all times subsequent to the death of plaintiff's husband, and up to May 25, 1911. (Paragraph 20.) The plaintiff herself does not support this in her testimony, and defendant denied it, while a witness for plaintiff. She vouched for his credibility by making him a witness, and there is much to impeach her credibility. I have already pointed out how she conflicts on what time she first thought she had been wronged.

Be all that as it may, the alleged representation was true. Defendant, as a witness for plaintiff, testified, without contradiction, that, at the time the stock was sold to him, and in all the early part of 1911, the market for railroad cars was poor and very stagnant; that, from then to June 7, 1911, the date of the purchase, the volume of business in the territory from which orders might be anticipated was constantly decreasing; and that, from all indications, he, at the time he bought, "honestly believed that the business would show a loss for the year 1911." It appears that, while the last seven months of 1910 yielded $850,144.30 in net earnings, the first five months of 1911 yielded but $149,366.67. The majority opinion itself discloses that the statement made was true, for it is said the business had not been good during the early part of 1911, as compared with the previous year, and that the company, during the first five

months, had earned a net profit of only $150,000.  The majority opinion concedes that the business of furnishing supplies for railroads is shown to be subject to changing conditions of the companies, and varies greatly from year to year, and that the year 1911 was concededly bad until after July (after the offer had been accepted), and that this may have affected "the outlook of the enterprise."  It is pointed out that, as one of the witnesses puts it, "the railroad world was at a low ebb" early in 1911.  How much the future is considered important by the court is made plain by adding to this that the same witness testified that, later on, "more of the company's share of orders" was obtained.

The way the majority avoids this situation is by injecting prophecy into *scienter*, by holding that, though the statement as to business conditions was true when made, it was actionable because the defendant ought to have taken a rosier view of future possibilities of improvement,—was actionable if, later, through unanticipated events, it transpired that the view of the offerant was more gloomy than the future justified.  Voss said, without contradiction, that the subsequent enhancement was due to great and unexpected profits, to wit, the receipt of $15,000,-000 in war orders, after the sale of the stock.  (Abstract 909.) Defendant, as a witness for plaintiff, testified to the effect that the betterment evidenced by the recapitalization was due to orders which neither party knew of or anticipated when the stock was bought.  (Abstract 147 *et seq.*)

Great profits accruing from the unanticipated world's war cannot be considered on whether the price paid without such anticipation is adequate.  *Colton v. Stanford*, 82 Cal. 351 (23 Pac. 16, 29, 32).  It may not be availed of that a gloomy outlook was unjustified, because later there was an active boom in the railroad business; because there came a most unprecedented demand for railroad securities, "owing to which the defendants found themselves in a most prosperous condition."  *Colton v. Stanford*, 82 Cal. 351 (23 Pac. 16, at 29).  To like effect is *Nicholson v. Janeway,* 16 N. J. Eq. 285; *Murray v. Elston*, 24 N. J. Eq. 310; *Twin Lick Oil Co. v. Marbury*, 91 U. S. 587; *Kitchen v. St. Louis, K. C. & N. R. Co.*, 69 Mo. 224.

There can be no question that, in the opinion of the major-

ity, the gravamen of the case against the defendant is that he refused to be prophetic and optimistic. We find it said in the opinion:

"But, while it appears there was local uncertainty of the future of the company, it had no local dealings except with the banks, and there its credit seems to have been unimpaired. There seems to have been no occasion for pessimism as to the future of this company, though some local capitalists of ripe judgment seem to have shaken their heads."

Again:

"If the business during 1911 was not good, this was due to a temporary situation, i. e., the fact that the railway companies were not purchasing cars and other materials in any considerable quantities, owing to attempts to reduce the rates fixed by the Interstate Commerce Commission. But this paved the way for larger orders in the future, and furnished no grounds for expectation of permanent cessation in the output of cars, as *subsequently* appeared. For all that appears the company would be unable to obtain and take care of its share of business in the future. Surely, there was every reason to believe that, in the future development of this enterprise, a fair income would be realized on the tangible property of the company."

Could there well be a balder pronouncement that, if a trustee truthfully states existing conditions, he will still be liable because he refuses to indulge in a sufficiently hopeful view of the future? The ultimate deduction of the court is that, because of an omission to deal on the basis of a *true outlook on the future*, the defendant failed in a duty "to truthfully and fully disclose the financial condition of the company," and that his failure to be an optimist resulted in his obtaining the stock for at least $560,000 less than the future proved its value to be.

If failure to be sufficiently optimistic makes the buyer liable, why should not the seller be liable if the view taken was too rosy, and it turns out, in future, that the price paid was too high?

What has been said as to the knowledge which Voss had is equally applicable at this point. He was informed, and was not deceived as to the condition of the business.

4. The majority repeats over and again that plaintiff relied· on defendant "quite as much, if not more, implicitly than she did on the advice of Voss," and that the evidence (quoted in the opinion) as a whole "indicates very satisfactorily that the plaintiff, throughout the transaction, reposed quite as much, if not more, confidence in the defendant than she did in Mr. Voss." The evidence quoted in the opinion falls into two classes: (a) Testimony which is utterly irrelevant on whether or not plaintiff placed any reliance on anyone. (b) Testimony which demonstrates that she did not rely on defendant, but did rely on Voss. As a sample, plaintiff testified that she would not have objected to having the defendant attend, but that Voss, though it was not expected by her, assumed all of it, and:

"I knew Mr. Voss was a gentleman whom I could talk with, and I needed someone to talk with. I know that I used Mr. Voss as a personal friend to talk matters with. Q. If you knew that Mr. Voss was director, would you regard him as a person who would look after it, and upon whom you relied to look after your interest? A. From a decidedly friendly standpoint. I supposed Mr. Voss was the only man whom I could talk with."

As said, every line of what is relevant in the testimony quoted in the opinion, instead of showing that there was more reliance on defendant than on Voss, shows that the sole reliance was on Voss. Add to this the fact that, when the parties thought of having a set of arbitrators, she selected Voss, and when they concluded that no set of arbitrators was needed, she made Voss her agent, to represent her.

It is absolutely established that something other than the relationship to defendant induced the sale, and that the plaintiff had no confidence in defendant. (Abstract 167, 168, 203, 225, 237, 810, 811, 812.) Plaintiff admits she knew the future was problematical, because the defendant was not the genius that her late husband had been. (Abstract 197, 198.) And Voss testified, without dispute, that plaintiff "had not any too much confidence in J. W. Bettendorf and in the continuance of the business, and knew the ups and downs of it." Plaintiff testifies, "I wanted to get free from the business." (Abstract 196, 197.) When asked what she thought the defendant meant by his inquiry if she had ever thought of selling her stock, she

answered, "Yes, I was anxious to get rid—to get out of the business; that is all." (Abstract 194.) It is important that there are personal reasons for retiring; that the sale "avoids the risk of the enterprise." *Banks v. Judah*, 8 Conn. 145; *Colton v. Stanford*, 82 Cal. 351 (23 Pac. 16, at 21.)

Be all that as it may, one who declines to deal with the fiduciary, but insists upon having the dealing done through an agent of her selection, and that the valuation be settled by him, cannot claim that she relied upon the fiduciary relation. Such conduct is a conclusive negation of such reliance. This is so though the agent does not fall within the independent adviser rule. The fact of insisting upon such an agent as the intermediary is precisely as conclusive against the claim of reliance as though an impartial, competent, independent adviser had been selected. The only difference is that, as against the honest adviser, there could be no claim, no matter how much he erred in judgment; while, as to the mere agent, if he was negligent or incompetent, or misconducted himself, there would be a remedy against him or any who colluded with him.

If the party to whom the representations were made, himself resort to means of verification, before entering into the contract, it is made to appear that he relied on his own investigations, and not on the representations. No claim of reliance on the relationship can in reason be made, where the complainant has undertaken to investigate for himself, called in experts, and acted upon his own judgment and the advice of friends. Kerr on Fraud & Mistake, 75 to 78. The burden to make full disclosure ceases to exist where the beneficiary acts exclusively on the advice of the professional friends selected to investigate and counsel, and selected "because of their ability and their knowledge of affairs of the trustees with whom he is dealing." *Colton v. Stanford*, 82 Cal. 351 (23 Pac. 16, at 22); *Blanc v. Connor*, 167 Cal. 719 (141 Pac. 217, at 220).

That one may not employ an agent to act for her, and then claim reliance upon the relation to the fiduciary, is true even between trustee and *cestui*. *Hoyt v. Latham*, 143 U. S. 553; *Ashcom v. Smith*, 2 P. & W. (Pa.) 211. The *cestui* may not give notice in advance that he should rely upon the investiga-

tion and advice of an agent of his selection, would rely on his trusted agents, and then say:

"You owe me reparation; your representations were incorrect. It was your duty to make them full, fair, and accurate. I claim a rescission upon the representations you made, although I did not deal with you."

See *Colton v. Stanford,* 82 Cal. 351 (23 Pac. 16, at 21).

5. There was no inadequacy, because plaintiff claims nothing except that she was defrauded as to her "common stock." It is conceded that the capitalization was one share common and four shares preferred stock. The court finds inadequacy on the theory that the shares of common stock sold transferred roughly a third interest in the property. But this is true only if there were no preferred stock, as aforesaid. Once show that there was such preferred stock, and make no showing that it has been retired or transferred by plaintiff to defendant, and it becomes plain that, instead of selling one third of the property, the common stock sold transferred but one fifteenth of that property. Manifestly, what may be inadequate if paid for a third can hardly be said to be inadequate when paid for a fifteenth. The preferred stock conveys as much of the corporate assets as the common. 1 Cook on Corporations (7th Ed.), Section 278; *Birch v. Cropper,* 14 App. Cas. 525 (1889).

The preferred stock should be considered, though appellant did not, in terms, urge, either in propositions or in argument, that the existence of that stock destroyed the claim of inadequacy. Appellant does raise that there was inadequacy. The record shows, without conflict, that nothing but common stock was sold, and that nothing but being overreached in the sale of common stock is complained of. The record shows, without dispute, that the preferred stock once existed, and it is presumed that this situation continued to exist. It appears without dispute that for one share of common stock there were four shares of preferred. This situation demands considering whether the existence of the preferred stock does not destroy all claim of inadequacy. It was not necessary to say as much in so many words. Argument *in extenso* is not necessary, to obtain appellate review.

Suppose the record showed without dispute that the parties had never met, and had never had a negotiation, and appellant asserted that the evidence did not show defendant had defrauded plaintiff. Would appellate review be denied merely because the appellant did not add an argument that he could not have over-reached the plaintiff, "because he had never met with her, seen her, or had had anything to do with her?"

I confess that our treatment of our rules is not easy for me to understand. In this one instance, we adhere to them. In case after case where there is no attempt at rule presentation, we ignore that fact. Be that as it may, in my opinion inadequacy is properly presented.

The allowance of $142,415.35 for alleged enhancement of the assets of defendant by release of the claims for royalties is, at any rate, four fifths too large, because here, too, the existence of preferred stock is overlooked.

The opinion itself points out how fluctuating and uncertain the operations of such a corporation as this are. Where the property is uncertain, speculative, or dependent upon uncertain or fluctuating conditions, the test of value is not in what the party might have made out of it had he retained it, "but what it could have been sold for outright" (*Cardoner v. Day,* 253 Fed. 572, at 584; *Appeal of Geddes,* 80 Pa. 442, 462; *Colton v. Stanford,* 82 Cal. 351 [23 Pac. 16, 19]); and there is no evidence that anyone would have paid more.

6. Plaintiff effected a settlement with defendant, and solemnly released him in full, by duly executed writing. She obtained $50,000 thereby. She retains it, and has not tendered it. The majority permits her to avoid this settlement and to obtain a half million dollars more, despite that settlement. The law on what will impeach a settlement is, as will presently be shown, perfectly plain.

On what facts is this accord and satisfaction nullified? Plaintiff testifies she first learned that there was something wrong with the sale "at the time when I read the notice in the papers;" read that there had been a recapitalization in $7,500,000. (Abstract 177.) This was in December, 1913. The train of suspicion was fired then. She was asked whether she was not of

opinion, when she saw this article and attempted to see Mr. Lane, that her rights had not been safeguarded,—whether read-ing about this recapitalization did not make her think this,— and she answered: "It certainly did." (Abstract 204.) When asked why she began this suit, she answered:

"Because I didn't think I was fairly treated, after I read the magnitude of that—that figure looked enormous—that $7,500,000." (Abstract 201.) And: "When I saw this article in the paper about this $7,500,000 corporation, I immediately thought there was something wrong about my selling out and only getting a half a million dollars."

To be sure, she also testified that she had not as much as a suspicion until long after she read that article, and that the first time she came to the conclusion she had been wronged was *in the spring of 1914.* Next, that not until she talked with her new attorney, Mr. Thomason, in the *fall of 1914,* did she learn in any way or believe there had been anything wrong with any of the transactions. This pushes the beginning of even sus-picion from December, 1913, up to the *fall of 1914.* The final edition is that this time "was the first time that I suspected that there had been anything wrong with any of those proceedings." (Abstract 178.)

Go back to her first statement, and we find that, when she read the newspaper article, about December 30, 1913, this hap-pened: She acted as soon as she read the newspaper article, because she thereby became convinced that she had been over-reached, and that she ought to ascertain the exact extent of her injury. She went to get satisfaction from someone (Abstract 237), some good lawyer, who, in her opinion, "would manage the matter." She wanted to get "the best that could be had at any price." It seemed to her she had to talk with someone, when she read this article (Abstract 172), and thereupon she at-tempted to see Mr. Lane for the purpose of retaining him "as my attorney to represent my interest to look into the matter of where that enormous amount of money had come from in so short a time, and to do that on my behalf" (Abstract 230, 239), to investigate the matter for her, to investigate "where that amount of money came from in such a short time" (Abstract 209). Before she settled, she learned that the litigation for

the chances of which a deduction of $110,000 had been made had been disposed of favorably to the company, without the expenditure of that sum.

Surely, she went into settlement in full belief that she had been wronged by the transaction of selling, as a whole. All that she did not know then and claims to know now is the extent of the injury she had suffered by selling. The settlement was not limited, as the majority suggests, to the $110,000 item originally deducted for possible patent litigation. This is so, first, because plaintiff, at this time, was asserting that she had been wronged, not by this deduction, but by the sale in its entirety; second, because, as the opinion concedes, the attorney for defendant "insisted that, if she had any other claims, she must assert them at that time, so that everything could be finally settled;" third, the instrument signed by plaintiff "ratified and confirmed the certain sale of common stock" she had made to defendant (not only the having had $110,000 deducted for patent litigation).

There was no fiduciary relation when the settlement was had. She no longer sustained such relation to defendant, and she did not then trust him, and professes to have then believed that he wronged her. By clear inference, she declares that, as soon as she read this newspaper article, she became distrustful of the defendant; for she says that, until she read that article, "nothing had occurred to make me distrust Mr. Bettendorf."

No one deceived her as to the extent of her injury, and she dealt with the lawyer of the man whom she was accusing of breach of trust and worse. He did not deceive her, and made clear that she was dealing at arm's length. True, it is argued that this lawyer overreached plaintiff; that she was once more defrauded; that no full explanation was made to her of the papers she was signing to effectuate the settlement; and that she was not fully advised as to their legal effect. I shall spend little time with this absurd claim of fraud, resting upon faith in the representations of an attorney for an opponent, as to whom she believed that he had defrauded her.

She was not lulled by anything Voss said to her, because she persisted in remaining desperate, and in obtaining counsel who would get her her rights. There is nothing to the assertion of the majority that, somehow or other, Voss satisfied her, after

she made her discovery. Despite what Voss said, she kept right on investigating, complaining, and employing counsel. The stubborn fact remains that she persisted in acting upon her suspicions and her desperation and excitement until she obtained additional money. This proves to a demonstration that Mr. Voss checked neither her suspicions, her excitement, her desperation, or her desire to employ counsel; proves to a demonstration that whatever Mr. Voss may have said did not affect her realization or her belief that the enormously enlarged capitalization indicated she had not been fairly dealt with in selling her stock.

The majority brushes aside this solemn settlement, made on large consideration, and permits a recovery of half a million dollars in addition, on two grounds. The first is the utterly irrelevant one that plaintiff was not too slow in beginning her suit. The question is not whether her suit was timely, but whether, though timely, she has any right to maintain it.

The second ground is that she had nothing to go on beyond a mere suspicion, and, therefore, was not put to inquiry. This simply overlooks that plaintiff settled when she fully believed she had been wronged in the purchase of the stock, and had not obtained enough money, and when she had the clue that the $2,000,000 corporation in which she sold stock had all at once become a $7,500,000 corporation; settled when she was asserting that she "did not know where all this money came from;" settled while she complained that she had been paid "but a half million dollars."

Here is no case of mere suspicion that a wrong had been perpetrated. Instead, it is a naked case of failure to ascertain the extent of injury from a wrong believed to have been committed, and the general nature of which was fully realized, and settling before making any attempt to ascertain the extent of the injury suffered. It is hornbook law that, where one believes he has been defrauded, the fact that he makes a settlement in ignorance of the extent of his injury will not avoid the settlement (*Barnes v. Century Sav. Bank*, 165 Iowa 141, 176), and is not fully informed as to his legal rights. And this is true even as to a *cestui. In Re Hoffman's Estate*, 183 Mich. 67 (152 N. W. 952); 2 Pomeroy on Equity Jurisprudence (3d Ed.) Sec. 964. He can-

not amplify his damages by delaying to inform himself as to the facts. *Nicholson v. Janeway*, 16 N. J. Eq. 285; *Murray v. Elston*, 24 N. J. Eq. 310; *Twin Lick Oil Co. v. Marbury*, 91 U. S. 587; *Kitchen v. St. Louis, K. C. & N. R. Co.*, 69 Mo. 224.

The means of obtaining knowledge makes the case equivalent to having knowledge. *Norris v. Haggin*, 28 Fed. 275, 280, approved in *Barnes v. Century Sav. Bank*, 165 Iowa 141; *Hinkley v. Sac Oil & P. L. Co.*, 132 Iowa 396, 409; *German Sav. Bank v. Des Moines Nat. Bank*, 122 Iowa 737, 744. A "clue which, if followed up, would lead to discovery is, in law, equivalent to a discovery—equivalent to knowledge." *Norris v. Haggin*, 28 Fed. 275, 280, quoted and approved in *Barnes v. Century Sav. Bank*, 165 Iowa 141; *Hinkley v. Sac Oil & P. L. Co.*, 132 Iowa 396, 409; *German Sav. Bank v. Des Moines Nat. Bank*, 122 Iowa 737, 743, 744. It was said in *Hinkley v. Sac Oil & P. L. Co.*, 132 Iowa 396, at 409, 410:

"He is not required to suspect the promoters and directors of disregarding their obligations to those whom it was their duty to protect. Where all seems fair, he is not bound to inquire as though the contrary were true. Of course, where the means of knowledge are at hand, and by ordinary diligence he should have ascertained the facts constituting the fraud, he will be charged with such knowledge. For the means of knowledge are equivalent to knowledge, and a clue which, if followed up with ordinary diligence, would lead to a discovery, in law is equivalent to a discovery—equivalent to knowledge."

It is added that this does not apply where plaintiff is lulled into security, "and did not suspect nor have any reasons to suspect the fraud practiced upon him, until a few days before beginning the action."

It is said in *Wood v. Carpenter*, 101 U. S. 135, 141:

" 'The presumption is that, if the party affected by any fraudulent transaction or management might, with ordinary care and attention, have seasonably detected it, he seasonably had actual knowledge of it.' "

" 'Whatever is notice enough to excite attention, and put the party on his guard and call for inquiry, is notice of everything to which such inquiry might have led. When a person has

sufficient information to lead him to a fact, he shall be deemed conversant of it.' ''

And if the defendant ''should have known of the fraud by the use of reasonable care and diligence,'' and obtains a benefit before obtaining such knowledge, he may not assert the fraud. *State Bank v. Brown,* 142 Iowa 190, 199.

In the last analysis, the question is whether one who thinks himself defrauded, and then makes a compromise, can thereafter add to the amount received in settlement, by merely showing that, when the settlement was made, he had not made the discoveries that his then knowledge suggested, but has since made them, and so has discovered that the fraud was more injurious than he believed it to be when he settled. Precisely that was involved in *Korn v. Becker,* 40 N. J. 408 (4 Atl. 434). There, a daughter claimed that her mother had defrauded her into accepting an inadequate price. The complainant was defeated, not because one may not receive damages after discovering a fraud, but because, believing she had been defrauded, she entered into an accord and satisfaction for her damages.

7.   While *Allen v. Pegram,* 16 Iowa 163, is an action on the law side, it does not follow that it prohibits rescinding in part and suing for damages in a law action only. Nothing indicates that the rule announced is not to obtain in a suit of equity.

8.   Voss induced the plaintiff and her parents to relinquish a claim of some $600,000 that the late W. P. Bettendorf had against his corporation on account of royalties. It appears, without dispute, that he never intended to assert such claim as a debt. Indeed, to have done so would have been a mere matter of bookkeeping; for, as he owned two thirds of the stock, he would have had to pay two thirds of what he received on account of royalties, and his brother the other third. It is true the release gave one third of whatever benefit resulted to the stockholding of the defendant, while, at the same time, it gave the same benefit to the third held by the widow and the parents. But the plaintiff fully realized that the defendant's stock was obtaining this ''advantage.'' It is undisputed that Voss advised this release because statements issued in the past had revealed no such indebtedness on part of the company, and because revealing it now might be dangerous to the credit of the corporation, al-

ready in somewhat precarious condition, owing to the death of the master spirit.

It is undisputed that, for the reasons already stated, W. P. Bettendorf had declared that he would not assert this claim as a debt of the corporation. The way the court disposes of that is to say that Voss also knew that the widow could take the fortune her husband had left her, and yet was under no obligation to heed his desire as to relinquishing said claim for royalties. All I care to say is that this is peculiar advice, coming from a court of conscience. Mr. Voss need not feel he was a bad agent or man, because he did not think along such lines as the majority suggest.